Edward Lewis **LAGRONE**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 71731.

Court of Criminal Appeals of Texas, En Banc.

Feb. 5, 1997.

Rehearing Denied April 9, 1997.

---

Allan K. Butcher, William S. Harris, Fort Worth, for appellant.

Steven W. Conder, Assist. Dist. Atty., Fort Worth, Matthew Paul, State's Atty., Austin, for the state.

---

\* Most of this opinion was prepared by Judge Bill White prior to his retirement from the Court.

1. Article 19.03(a)(6)(A) of the 1993 Texas Code of Criminal Procedure has been recodified under Article 19.03(a)(7)(A) of the 1995 Code.

2. Texas capital sentencing procedure has undergone several important changes during the interim between the commission of the instant capital offense in May of 1991 and the handing down of this opinion. On September 1, 1991, the Legislature added a statutory mitigation special issue for the jury's consideration, but specifically provided that this new procedure was not to be applied retroactively—to cases arising before September 1, 1991. The Legislature in effect created two separate capital sentencing procedures: (1) defendants whose crime was committed *prior* to September 1, 1991 were to be sentenced under the 1990 version of Article 37.071 without a statutory mitigation special issue; and (2) defendants whose crime was committed *after* September 1, 1991 were to be sentenced under the 1991, *et. seq.*, versions of Article 37.071 which includes a statutory mitigation special issue.

On August 30, 1993, however, the Legislature again changed capital sentencing by specifically requiring the submission of a statutory

## OPINION

KELLER, Judge.\*

In May, 1993, appellant was tried and convicted of three counts of capital murder pursuant to Section 19.03(a)(6)(A) of the Texas Penal Code for the murder of more than one person in the same criminal transaction.[1] Tex. Penal Code Ann. § 19.03(a)(6)(A) (Vernon's 1993). The jury answered the statutorily required special issues submitted under Article 37.071 of the Texas Code of Criminal Procedure in a manner consistent with imposing the death penalty.[2] Tex.Code Crim. Pro. Ann. art. 37.071(b) (Vernon's 1990). Accordingly, the trial court followed its statutory mandate to sentence appellant to death. Tex.Code Crim. Pro. Ann. art. 37.071(e) (Vernon's 1990). Appeal to this court is automatic. Tex.Code Crim. Pro. Ann. art. 37.071(h) (Vernon's 1990).

Appellant raises twenty-six points or error, but does not challenge the sufficiency of the evidence at either the guilt-innocence or punishment stage of the trial. Because several of appellant's points are fact-intensive, however, we will proceed with a brief recitation of pertinent facts. Our review of the briefs

mitigation special issue for *all* cases. Thus, the Legislature essentially abolished the procedural dichotomy created by the 1991 session by eliminating the central procedural difference between pre and post 1991 capital sentencing—the mandatory submission of a statutory mitigation special issue. The 1990 version of Article 37.071, however, still had some minor procedural differences with the 1991, *et seq.*, versions of the statute which the Legislature resolved by formally splitting the statute: (1) Article 37.071 controlled all cases arising *after* September 1, 1991; and (2) Article 37.0711 governed all cases arising *before* September 1, 1991. This basic framework is still intact today.

In keeping with these somewhat complex guidelines, the defendant was sentenced under the controlling law at his May, 1993 sentencing. In May of 1993, Texas capital sentencing law required the defendant to be sentenced under the 1990 version of Article 37.071. Although the defendant would now be sentenced under Article 37.0711, Article 37.0711 did not become effective until after the defendant's sentencing. Therefore, we must review the sentencing as it existed in May of 1993 under the 1990 version of Article 37.071. At that time, Article 37.071 of the Texas Code of Criminal Procedure did not contain a statutory mitigation special issue.

and record indicates that the following facts were established at trial.

In May 1991, the Lloyd family was living at 2004 Amanda Street in Fort Worth. The Lloyd family included eight people: three homicide victims—ten year-old Shakeisha Lloyd, and Shakeisha's two great aunts, eighty-three year-old Zenobia Anderson and seventy-six year-old Caola Lloyd, as well as five survivors of the homicidal incident— Pamela Lloyd (Shakeisha's mother), Shakeisha's three siblings, and Dempsey Lloyd (Shakeisha's uncle).

Pamela Lloyd first met appellant in 1985, and the two were involved in a relationship for approximately six months. After their breakup, however, the Lloyd family maintained contact with appellant because he would intermittently visit the children at home.

On May 26, 1991, Pamela Lloyd noticed that Shakeisha's body was changing and that her breasts were getting bigger. Because this seemed unnatural, Pamela Lloyd took Shakeisha to the local hospital for an examination where she learned Shakeisha was pregnant. Pamela Lloyd then contacted the police about appellant's rape of her daughter. In response to the rape charges, the police took Pamela Lloyd to appellant's Arlington apartment where she asked appellant's sister to have appellant contact her. When appellant called her, Pamela Lloyd asked him how he could have "messed" with Shakeisha. Appellant denied having sexual relations with Shakeisha so Pamela Lloyd hung up the telephone. Later that day, however, appellant called Pamela Lloyd back to tell her that he was sorry for what he had done to Shakeisha and that he would take care of the baby. Pamela Lloyd responded with outrage because appellant had molested Shakeisha nine times, and threatened to press charges.

The next day, Shakeisha contacted appellant via his beeper, and Pamela Lloyd used the opportunity to inform him that Shakeisha wanted an abortion which would cost approximately $895 dollars. Appellant responded by assuring Pamela Lloyd that he would provide the abortion money. On Wednesday, May 29, 1991, appellant attempted to get Pamela Lloyd to drop her complaint by offering to give her $1000 dollars for the abortion and $500 dollars for herself. Pamela Lloyd, however, refused to withdraw the complaint. Appellant called later that day and told Pamela Lloyd that he would deliver the money for the abortion on Thursday.

That same Wednesday, appellant went to the Winchester Gun Store with his friend, Anetta Daniel. After supplying Daniel with the purchase money, appellant asked her to purchase a double-barrel, pistol-grip shotgun. Daniel purchased a Winchester slide-action shotgun which appellant put in the trunk of the his car. At trial, Robert Wilshire, an employee of the gun store, testified that this shotgun qualifies as a deadly weapon.

On Thursday, May 30, 1991, Pamela Lloyd got up around 4:00 a.m. to get some water from the kitchen because she was having trouble sleeping. After she had left the kitchen and entered the bathroom, somebody knocked at the front door and demanded that one of the Lloyds "open the door." Shakeisha's brother, Charles, identified the voice as appellant's, but Dempsey Lloyd answered the door. After allowing Dempsey Lloyd to open the door and ask him what he wanted at such an early hour, appellant shot Dempsey Lloyd with the aforementioned shotgun. Dempsey Lloyd subsequently grappled with appellant over the gun.

Following this struggle, appellant went into the front bedroom where Caola Lloyd was sleeping and fired a shot. Appellant then went into the kitchen where Zenobia Lloyd was washing clothes and fired another shot. As Pamela Lloyd and Shakeisha attempted to collect and hide the other children, several more shots were fired. Pamela Lloyd then discovered Shakeisha lying on the floor with "half of her face blown off." Although Dempsey Lloyd pled for mercy, appellant shot him a second time before leaving. Dempsey Lloyd was still able to go next door and call for emergency "911" assistance despite his severe wounds.

Following the above homicidal incident, the Tarrant County Medical Examiner's Office performed autopsies on Caola Lloyd, Zenobia Anderson, and Shakeisha Lloyd. The medical examiner determined the cause of death

for all three of the deceased victims to be a single homicidal incident. Caola Lloyd suffered an entry wound caused by a shotgun in the anterior portion of her neck going through the left side of her throat. She also had a defensive injury to her right hand resulting in the dismemberment of her index finger, which was consistent with her right hand being in front of her face when the gun shot was fired. Zenobia Anderson had an entry wound caused by a shotgun to the back of her neck. Shakeisha Lloyd had an entry wound caused by a shotgun to her left cheek and a corresponding exit wound just below the rim of the right mandible jaw bone. She also had an injury to her right hand, causing the total dismemberment of her ring finger. The medical examiner determined there were most likely two gun shots.

In addition, the medical examiner recovered a four-to-five month-old female fetus, which was preserved for blood and DNA testing. Dr. Arthur Eisenberg, a forensic pathologist, compared appellant's blood samples with those recovered from Shakeisha Lloyd, and conducted DNA testing to establish paternity.[3] Based upon this examination, Dr. Eisenberg concluded that appellant's paternity of Shakeisha Lloyd's unborn child was 99.999% certain; and testified that, with the exception of having an identical twin brother, appellant was the father of that child.

During the punishment phase of the trial, moreover, the State produced a fairly imposing catalog of relevant punishment evidence. First, the State introduced evidence that appellant had been convicted of murder in 1977, and received a twenty-year sentence. The State also produced numerous reputation witnesses who testified that appellant had a bad reputation for being peaceable and law-abiding. Finally, the State introduced evidence of several extraneous offenses committed by appellant.

On March 3, 1991, Officer Keith McGuire of the Fort Worth Police Department witnessed appellant flagging down cars in a manner consistent with drug dealing. The officer subsequently observed appellant toss a black pouch to the ground which was later determined to contain a quantity of crack cocaine.

On October 14, 1990, Officer Greg Abernathy of the Fort Worth Police department was involved in a routine investigation of potential drug trafficking, and received a tip about a local drug trafficker from one of the suspects. The tip led Officer Abernathy to a nearby apartment complex where he found a man matching the suspected drug trafficker's description—appellant. After being confronted by the police, appellant ran up some stairs and attempted to jettison a brown bag. The police laboratory later confirmed that the bag contained a quantity of cocaine.

On February 23, 1986, fifteen year-old sisters were returning home from a nearby Dairy Queen. While they were crossing the grounds of a local elementary school, appellant approached them and threatened them with a gun. Appellant took the sisters' money, forced them to remove their clothing, tied them up, and proceeded to force one girl to perform oral sex and molest her sister. After threatening to burn down the girls' home if they went to the police, the girls did not contact the authorities at that time.

We will address each of appellant's points of error in chronological order unless otherwise noted.

### I.

In his first four and eighteenth points of error, appellant argues that the trial court erred by restricting appellant's questioning of five members of the jury venire concerning their understanding of the term "probability."[4] Appellant's arguments center

---

3. The DNA testing revealed that appellant's DNA was included in all eight regions where chromosomes were matched.

4. In his eighteenth point of error, appellant attempts to draw a distinction between points of error one through four and point or error eighteen on the basis that the trial judge had already

allowed the defense to begin questioning one of the jurors about his understanding of the term "probability." As we are not aware of any way that our jurisprudence imposes timing restrictions on trial judges' *discretion* to limit voir dire examination, we are unable to discern a valid basis for appellant's proposed distinction. Ac-

around this Court's decision in *Woolridge v. State*, 827 S.W.2d 900 (Tex.Cr.App.1992). In *Woolridge*, we held that the trial court's refusal to allow a defendant to question a veniremember regarding his understanding of the term "reasonable doubt" constituted reversible error. However, the *Woolridge* Court specifically distinguished its non-capital trial holding from the capital trial context because voir dire examination in capital trials is conducted on an individual, rather than collective, basis. *Woolridge*, 827 S.W.2d at 905; *Wheatfall v. State*, 882 S.W.2d 829, 835 (Tex.Cr.App.1994) (relying on *Woolridge* decision in capital trial context); *see also* TEX. CODE CRIM. PROC. ANN. art. 35.17(2) (mandating that trial judge instruct the jury on definition of reasonable doubt—making further inquiry into jury's understanding of "probability" as it relates to the burden of proof in our special issue on future dangerousness repetitive and unnecessary).[5] Thus, we must evaluate appellant's claims under our established standard for reviewing judicial limitation of capital voir dire.

■■■■ We generally employ an abuse of discretion standard when reviewing allegations that the trial court improperly restricted voir dire examination. *Nunfio v. State*, 808 S.W.2d 482, 484 (Tex.Cr.App.1991); *Smith v. State*, 703 S.W.2d 641, 643 (Tex.Cr. App.1985). Moreover, our review of our capital jurisprudence reveals that we have determined that a trial court does not abuse its discretion by refusing to permit counsel to question a veniremember regarding his definition of the term "probability." *Milton v. State*, 599 S.W.2d 824, 826 (Tex.Cr.App.1980), *cert. denied*, 451 U.S. 1031, 101 S.Ct. 3022, 69 L.Ed.2d 400 (1981) (finding no abuse of discretion where trial court refused voir dire questioning on definitions of terms deliberately, probability, and criminal acts of violence in a capital case); *see also Wheatfall v. State*, 882 S.W.2d 829, 835 (Tex.Cr.App.1994)

(endorsing proposition that trial court in capital proceedings has discretion to prohibit voir dire on definitions of undefined terms in charge). Otherwise, "voir dire examination could take an unreasonable length of time if attorneys on both sides selected different words throughout a contemplated charge and asked each prospective juror what those words meant." *Wheatfall*, 882 S.W.2d at 835. Accordingly, appellant's first through fourth and eighteenth points of error are overruled.

## II.

In points of error five through eight, appellant contends that the trial court erred by ordering him to submit to a State psychiatric examination without the presence of defense counsel. Appellant's arguments fall into two discrete categories: (1) points of error five and six involve alleged violations of appellant's right against self-incrimination as contained in both the Fifth Amendment to the United States Constitution and Article I, § 10 of the Texas Constitution; and (2) points of error seven and eight assert that appellant's right to counsel under the Sixth Amendment to the United States Constitution and Article 1, § 10 of the Texas Constitution was violated by the exclusion of defense counsel from the State's psychiatric exam.

To dispose of these issues effectively, we must begin with a recitation of the factual circumstances applicable to these points of error. On March 15, 1993, appellant filed a motion seeking independent expert witnesses in the areas of psychiatry and psychology. In support of this motion, appellant alleged that his mental condition would be a significant factor during the punishment phase, and that he suffered from "serious mental disorders." The trial court granted appellant's motion by appointing Dr. Richard Schmitt as appellant's mental expert.

---

cordingly, we will address point of error eighteen along with points of error one through four.

5. TEX.CODE CRIM. PROC. ANN. art. 35.17(2) (Vernon's 1995) (Emphasis ours) provides:

"In a capital felony case, in which the State seeks the death penalty, the court shall propound to the entire panel of prospective jurors questions concerning the principles as applica-

ble to the case on trial, of *reasonable doubt*, burden of proof, return of indictment by grand jury, presumption of innocence, and opinion. Then, on demand of the State or defendant, either is entitled to examine each juror on voir dire individually and apart from the entire panel, and may further question the juror on the principles propounded by the court."

In response, the State filed a subsequent motion requesting independent mental examination of appellant for purposes of rebuttal. The State's motion also requested that the court exclude the testimony of appellant's mental health expert if appellant failed to cooperate with the State's expert. After an extensive hearing, the trial court granted the State's motion by allowing Dr. Richard Coons to examine appellant, subject to several rather stringent restrictions.[6] On May 6, 1993, Dr. Coons attempted to examine appellant, but appellant refused to cooperate even after Dr. Coons suggested he consult with his attorney. Due to appellant's lack of cooperation, Dr. Coons was unable to reach a conclusion about appropriate punishment.

At trial, appellant presented Dr. Schmitt's expert testimony on the issue of future dangerousness—that appellant would not constitute a continuing threat to society. The State then attempted to rebut Dr. Schmitt's testimony regarding his psychological examination of appellant with Dr.Coons' testimony. Dr. Coons testified that he had attempted to evaluate appellant, but appellant had refused to cooperate. In order to rebut Dr. Schmitt's testimony, therefore, the State introduced Dr. Coons' opinion of the future dangerousness of a hypothetical individual who had committed acts consistent with the other evidence evinced during trial. Dr. Coons concluded that there was a probability that the hypothetical defendant would constitute a continuing threat to society.

## A.

Appellant's fifth and sixth points of error attack the trial court's order directing the defendant to submit to an examination by the State's mental expert on two fronts: (1) the right against self-incrimination contained in the Fifth Amendment to the United States Constitution; and (2) the right against self-incrimination contained in Article I, § 10 of the Texas Constitution. Since our opinion in *Soria v. State*, 933 S.W.2d 46 (Tex.Cr.App. 1996) most recently addressed the issue of whether a trial court can constitutionally compel a defendant to submit to an independent State mental exam, we will first look to *Soria* for guidance.

In *Soria*, we expressly overruled this Court's plurality opinion in *Bradford v. State*, 873 S.W.2d 15 (Tex.Cr.App.1993)(plurality opinion) [7] by holding that:

> ... when the defendant initiates a psychiatric examination and based thereon presents psychiatric testimony on the issue of future dangerousness, the trial court may compel an examination of appellant by an expert of the State's or court's choosing and the State may present rebuttal testimony of that expert based upon his examination of the defendant; provided, however, that the rebuttal testimony is limited to the issues raised by the defense expert.

*Soria*, 933 S.W.2d at 58–59 (footnotes omitted). This holding was based upon the premise that "a defendant waives his Fifth Amendment rights to a limited extent by presenting psychiatric testimony on his behalf." *Id.* at 53. Indeed, we explained that the "introduction by the defense of psychiatric testimony based upon an examination of

---

**6.** The restrictions were as follows:

1. State shall notify the defendant's counsel, in advance of the time and place of the examination. Defendant's counsel may not be present during the examination. The defendant may recess the interview and consult with counsel.

2. Dr. Coons shall not relate by any manner or means his conversations, findings, conclusions and opinions with any State prosecutors or agents. Dr. Coons shall reduce his findings, conclusions and opinions to writing and deliver the same to the Court for in-camera inspection.

3. The Court, after examination of Dr. Coons' report, will decide whether to release the ultimate conclusions only. If the Court determines the report to contain Brady material, it shall release that [material] to the attorneys.

4. The State may have Dr. Coons present in court if the defense presents a mental health expert to testify.

5. If the defense calls a mental health expert to testify, at that time, Dr. Coons' report shall be turned over to the State by the Court.

**7.** In *Bradford*, a plurality of this Court held that a trial court's order conditioning the admissibility of the defense expert's future dangerousness testimony on the defendant's submission to a state-sponsored mental examination was violative of the Fifth and Sixth Amendments. We expressly declined to follow *Bradford* in *Soria*. *Soria*, 933 S.W.2d at 59–60 n. 21.

the defendant 'constitute[s] a waiver of the defendant's Fifth Amendment privilege *in the same manner as would the defendant's election to testify at trial.'* *Id.* at 54 (quoting *Battie v. Estelle,* 655 F.2d 692, 701–02 (5th Cir.1981))(emphasis ours); *see also Buchanan v. Kentucky,* 483 U.S. 402, 422–23, 107 S.Ct. 2906, 2917–18, 97 L.Ed.2d 336 (1987) (concluding that when the defense requests a psychiatric evaluation or presents psychiatric evidence, the defendant has waived the Fifth Amendment privilege and that the prosecution may "at the very least" rebut the defense's presentation with evidence from the defense-sponsored psychiatric reports); *Wilkens v. State,* 847 S.W.2d 547, 551 (Tex.Cr.App.1992), *cert. denied,* 507 U.S. 1005, 113 S.Ct. 1646, 123 L.Ed.2d 268 (1993)(determining that raising the insanity defense and offering supporting evidence waives the defendant's Fifth Amendment rights as to the State's use of psychiatric rebuttal evidence); *Hernandez v. State,* 805 S.W.2d 409 (Tex.Cr.App.1990), *cert denied,* 500 U.S. 960, 111 S.Ct. 2275, 114 L.Ed.2d 726 (1991)(holding that criminal defendants "open the door" to state-sponsored rebuttal on issue of competency by presenting defense-sponsored expert testimony). Accordingly, our decision in *Soria* stands for the proposition that once a defendant has executed a limited waiver of the Fifth Amendment's protection by constructively testifying through an expert on the issue of future dangerousness, the trial court may order that defendant to submit to a state-sponsored future dangerousness examination. *Soria,* 933 S.W.2d at 58–60.

After further consideration of the issue, however, we feel compelled to expand the scope of our rule in *Soria* to allow trial courts to order criminal defendants to submit to a state-sponsored psychiatric exam on future dangerousness when the defense introduces, *or plans to introduce,* its own future dangerousness expert testimony. Prohibiting the trial court from ordering a psychiatric exam until after the defense has actually presented his own expert testimony is bound to work against the State in almost every case. Indeed, we have already recognized that a trial court cannot actually force the defendant to cooperate with the State's ex-

pert, and the sanction of limiting the testimony of further defense witnesses is virtually worthless since the defense has already had the benefit of their own expert's testimony. *Soria,* 933 S.W.2d at 58–60. Our sense of justice will not tolerate allowing criminal defendants to testify through the defense expert and then use the Fifth Amendment privilege against self-incrimination to shield themselves from cross-examination on the issues which they have put in dispute. *Bradford,* 873 S.W.2d at 26 (Campbell, J., dissenting); *cf. Cantu v. State,* 738 S.W.2d 249, 256 (Tex.Cr.App.1987) (finding no Fifth Amendment impediment to forcing criminal defendants to make the "very difficult choice" between claiming the immunity from prosecutorial examination provided by the right against self-incrimination and waiving the Fifth Amendment's self-incrimination protection by testifying on their own behalf). Therefore, "[t]he interest of the other party [the State] and the function of the courts of justice to ascertain the truth become relevant, and prevail in the balance of determining the scope and limits of the Fifth Amendment." *United States v. Byers,* 740 F.2d 1104, 1114 (D.C.Cir.1984) (quoting *Brown v. United States,* 356 U.S. 148, 155–56, 78 S.Ct. 622, 626–27, 2 L.Ed.2d 589).

We are fully aware that the defendant has not actually waived his Fifth Amendment rights until he has actually presented expert testimony on the issue of future dangerousness at trial. Because of the unique circumstances discussed above, however, we have decided that it is necessary to employ a sort of "legal fiction" in these cases which infers a limited waiver of the defendant's Fifth Amendment rights once he has indicated an intent to present future dangerousness testimony. *See Giarratano v. Procunier,* 891 F.2d 483, 488 (4th Cir.1989) (holding defendant's stated intention to introduce psychiatric testimony at sentencing enabled the State to introduce psychiatric testimony at sentencing based on a pretrial examination); *see also Buchanan,* 483 U.S. at 422–23, 107 S.Ct. at 2917–18 (stating that when a defendant "requests" a psychiatric evaluation, the State has the right to rebut with evidence from the reports prepared pursuant to the defense-

sponsored examination); *Estelle v. Smith,* 451 U.S. 454, 468, 101 S.Ct. 1866, 1876, 68 L.Ed.2d 359 (1981)(noting that a defendant "who neither initiates nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him in a capital proceeding"). Accordingly, we now hold that when the defense demonstrates the intent to put on future dangerousness expert testimony, trial courts may order defendants to submit to an independent, state-sponsored psychiatric exam prior to the actual presentation of the defense's expert testimony.[8]

In light of our holding today, we find no violation of the defendant's Fifth Amendment rights. We also note that appellant has failed to provide us with any distinction or reason that the Texas Constitution provides greater protection than the Fifth Amendment. Consequently, it is not necessary for us to address the merits of appellant's sixth point of error. Appellant's fifth and sixth points of error are overruled.

### B.

■ Appellant's seventh and eighth points error, on the other hand, question the constitutional validity of excluding defense counsel from the State's psychiatric exam under the right to counsel guaranteed by the Sixth Amendment of the United States Constitution and Article I, § 10 of the Texas Constitution. As with the previous two points of error, appellant's contentions are groundless.

In *Bennett v. State,* 766 S.W.2d 227 (Tex. Cr.App.1989), we held that a defendant does not possess the right to have counsel present during a psychiatric examination under either the Fifth or Sixth Amendment. *See Bennett v. State,* 766 S.W.2d 227, 231 (Tex. Cr.App.), *cert. denied,* 492 U.S. 911, 109 S.Ct. 3229, 106 L.Ed.2d 578 (1989). Indeed, we reasoned that "[b]ecause of the intimate, personal and highly subjective nature of a psychiatric examination, the presence of a third

party in a legal or non-medical capacity would severely limit the efficacy of the examination." *Id.* Moreover, appellant has once again neglected to provide us with any rationale to support providing more stringent constitutional protection under Article I, § 10 of the Texas Constitution than that provided by the Sixth Amendment. Appellant's seventh and eighth points of error are accordingly overruled.

### III.

In points of error nine through thirteen, appellant alleges that the trial court erred in several ways by refusing to allow the development of testimony concerning the drug addiction of a witness to and victim of the crime, Pamela Lloyd.

### A.

Appellant's ninth point of error, in fact, asserts that the trial court erred by forbidding the defense from impeaching Pamela Lloyd's ability to perceive, recall, and relate the details of the crime with evidence of her alleged drug use and subsequent "withdrawal symptoms." More concisely, appellant claims that the inchoate drug use of one of the State's principal witnesses impaired her perceptual capacity. Appellant cites two cases in support of the proposition that a witness' perceptual capacity may be challenged by drug addiction evidence. *See Anderson v. State,* 65 Tex.Crim. 365, 144 S.W. 281 (1912); *Beland v. State,* 86 Tex. Crim. 285, 217 S.W. 147 (1920). Our examination of these cases reveals that this Court did indeed allow, and even protect, a right to utilize a witness' drug addiction as an impeachment tool during the early 1900's.

■ This Court, however, implicitly abolished the impeachment of witnesses with evidence of drug addiction with the adoption of the Texas Rules of Criminal Evidence. *See* TEX.R.CRIM. E. 608(b) (banning admis-

8. Because the defendant has not actually waived his Fifth Amendment protection prior to the presentation at trial of future dangerousness expert testimony, it is crucial for the trial court to protect the defendant's Fifth Amendment rights. Indeed, in this case, the trial court deserves commendation for its efforts in ensuring that the

defendant's Fifth Amendment rights were protected to the greatest possible extent. Other courts would do well in the future, in fact, to follow the guidelines adhered to by the trial court in this case. *See* Note 6, *supra* (setting out the trial court's guidelines).

sion of specific instances of conduct); *Ramirez v. State*, 802 S.W.2d 674, 676 (Tex.Cr. App.1990) (construing Rule 608(b) to exclude collateral drug addiction evidence). Indeed, Criminal Rule 608(b) expressly prohibits the utilization of specific instances of conduct—such as drug addiction evidence—for impeachment except to expose bias, correct any affirmative misrepresentations made on direct examination, or demonstrate lack of capacity. *See Ramirez*, 802 S.W.2d at 675–76 (finding error in trial court's allowance of impeachment on collateral drug addiction issue); Tex. Practice § 608.1, p. 576–77 (Goode, Wellborn, & Sharlot 1993) (discussing Rule 608(b)'s exclusion of collateral drug addiction evidence except under very limited circumstances). Although long term alcohol or drug use may produce some minimal effects on witness' perceptual capacity, this Court has consistently classified inchoate alcohol and drug usage as specific instances of conduct which are immune from impeachment. *See Ramirez*, 802 S.W.2d at 675–76 (limiting impeachment on drug or alcohol use to actual intoxication unless the witness leaves a false impression); *Kennedy v. State*, 150 Tex.Crim. 215, 200 S.W.2d 400, 404–05 (1947) (excluding impeachment evidence of drunkenness unless the condition is contemporaneous with the commission of the crime); *Newton v. State*, 150 Tex.Crim. 500, 202 S.W.2d 921, 928 (1947) (requiring drunkenness during the witness' perception of the crime to support impeachment); *see also* Tex. Practice § 608.1, p. 576–77 (Goode, Wellborn, & Sharlot 1993) (portraying *Ramirez* as the leading case on the use of drug addiction for impeachment and determining that inchoate drug use is a collateral matter); Tex. Practice § 607.4, p. 563–64 (Goode, Wellborn, & Sharlot 1993) (concluding that Texas Courts do not consider alcohol or drug use a viable capacity issue except when intoxication is contemporaneous with the witnessed events). Accordingly, we have held that a witness' credibility is only subject to attack on cross-examination when their perceptual capacity is physically impaired by the intoxicating effects of alcohol or drugs during their observation of pertinent events. *Id.*

■ Therefore, we refuse to allow appellant in this case to circumvent Criminal Rule 608(b)'s moratorium on the use of specific instances of conduct for impeachment by allowing specific conduct evidence of inchoate prior drug use to slip in under the guise of nebulous "withdrawal symptoms." Counsel must demonstrate an actual drug-based mental impairment during the witness' observation of the crime in order to pursue impeachment of a witness' perceptual capacity with evidence of drug addiction. *Cf. Ramirez*, 802 S.W.2d at 676 (reversing the trial court on the grounds that counsel failed to demonstrate the requisite physical influence of heroin at the time of the witness' perception). Consequently, we not only overrule appellant's ninth point of error, but also repudiate the anomalous impeachment rule advanced by the pre-rules cases of *Anderson* and *Beland.*

### B.

■ In points of error ten and twelve, moreover, appellant argues that the trial court violated the confrontation clauses of the United States and Texas constitutions by excluding from trial evidence of Pamela Lloyd's drug use. The United States Constitution's Confrontation Clause affords criminal defendants with the right to confront the witness against them. Importantly, this confrontational guarantee includes the right to conduct all legally proper cross-examination—cross-examination which is designed to expose a witness' testimonial motivations. *See Moody v. State*, 827 S.W.2d 875, 891 (Tex.Cr.App.1992). However, the trial court also maintains broad discretion to impose reasonable limits on cross-examination to avoid, *inter alia*, harassment, prejudice, confusion of the issues, endangering the witness, and the injection of cumulative or collateral evidence. *Id.* Thus, the trial court exceeds its discretion only when it prohibits a defendant from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness. *Id.*

■ In this case, appellant alleges that the trial court's refusal to allow the impeachment of Pamela Lloyd with evidence of the effects of her withdrawal from cocaine was a

violation of the Sixth Amendment's Confrontation Clause. As discussed in our denial of appellant's ninth point of error above, however, our interpretations of Texas Rule of Criminal Evidence 608(b) have limited the use of alcohol and drug addiction evidence for impeachment to instances where the witness is actually under the intoxicant's influence during the perceptual window of the crime. *See* Section III–A, *supra*. Pamela Lloyd was not under the influence of cocaine during the commission of this capital murder. Accordingly, we must classify Pamela Lloyd's alleged drug usage and accompanying withdrawal symptoms as precisely the type of specific conduct evidence which Texas Rule of Criminal Evidence 608(b) prohibits. *See* TEX.R.CRIM. E. 608(b); *Ramirez*, 802 S.W.2d at 675–76 (discussing collateral and prejudicial nature of drug addiction impeachment). The trial court was not outside the scope of its discretion in excluding specific conduct evidence which we have determined to be both prejudicial and collateral. *Id.* Moreover, appellant has failed to point out any meaningful distinctions between the confrontation clauses in the Federal and Texas Constitutions which merit our extension of broader confrontational capacity under Article I, Section 10 of the Texas Constitution. We overrule appellant's tenth and twelfth points of error.

## C.

■ In points of error eleven and thirteen, appellant maintains that the trial court's omission of evidence about Pamela Lloyd's drug addiction deprived the defendant of effective assistance of counsel in violation of both the United States and Texas Constitutions. However, appellant completely fails to provide authority for and to explain the manner in which the trial court's actions deprived him of effective assistance of counsel. Without substantive argument or supporting authorities, we cannot adequately evaluate appellant's effective assistance claim. *See* TEX.R.APP. P. 74(f) (requiring a minimal argument to support points of error in brief); *see also Kirchner v. State*, 739 S.W.2d 85, 87 (Tex.App.—San Antonio 1987, no pet.) (allegation of error not reviewable when appellant fails to provide supporting

argument and authority). Consequently, we must overrule appellant's eleventh and thirteenth points of error.

## IV.

■ In point of error fourteen, appellant urges that the trial court abused its discretion by sustaining the State's objection to a proper voir dire question posed by defense counsel to venireman Phillip Lee Hyder concerning mitigating evidence. Specifically, appellant complains that the trial court abused its discretion by limiting the voir dire examination of Hyder regarding his definition of the term "criminal acts of violence". Once again, appellant primarily bases his complaint on our decision in *Woolridge v. State*, 827 S.W.2d 900 (Tex.Cr.App.1992) where this Court held that the trial court's refusal to allow a defendant to question a veniremember regarding his understanding of the term "reasonable doubt" constituted reversible error. *Woolridge*, 827 S.W.2d at 906. As we stated earlier, the *Woolridge* Court went to great pains to exclude the individualized voir dire examinations conducted in capital proceedings from its holding relating solely to the collective voir dire questioning conducted in other criminal actions. *Woolridge*, 827 S.W.2d at 905; *see also Wheatfall v. State*, 882 S.W.2d 829, 835 (Tex. Cr.App.1994) (holding limitation of voir dire examination on definition of "deliberately" proper in capital case).

Moreover, we have consistently upheld trial judges' discretion to prohibit voir dire examination on the term, "criminal acts of violence" in capital trials. *See Milton v. State*, 599 S.W.2d 824, 826 (Tex.Cr.App.1980), *cert. denied*, 451 U.S. 1031, 101 S.Ct. 3022, 69 L.Ed.2d 400 (1981) (holding no abuse of discretion where trial court refused questioning on definitions of terms "deliberately, probability and criminal acts of violence" in capital case); *Battie v. State*, 551 S.W.2d 401, 405 (Tex.Cr.App.1977) (determining that trial court did not abuse its discretion in denying questioning regarding veniremember's understanding of term "criminal acts of violence" in capital appeal); *see also Woolridge*, 827 S.W.2d at 905 (affirming trial judge's discretion to limit voir dire investigations

into undefined terms in capital proceedings). "If counsel were permitted to inquire into the definition of every term during trial, [capital] voir dire would become endless." *Wheatfall v. State,* 882 S.W.2d 829, 835 (Tex.Cr.App. 1994). Accordingly, we hold that it was within the trial court's discretion to limit appellant's voir dire examination of veniremember Phillip Lee Hyder regarding his definition of the term "criminal acts of violence." Appellant's fourteenth point of error is overruled.

### V.

In points of error fifteen and sixteen, appellant contends that the trial court erred by denying appellant's request for exculpatory information contained in the victim impact statement; and by denying appellant's motion for new trial after it was shown the victim impact statement contained exculpatory information which was revealed to appellant only after the conclusion of the trial. The victim impact statement did indeed contain an admission by Pamela Lloyd that her "mind wandered" after the incident; a statement which the defense believed would effectively impeach Pamela Lloyd's identification of the defendant. Appellant asserts that this statement merits a new trial because it supports their theory that Pamela Lloyd was incapable of accurately identifying the defendant due to her withdrawal from crack cocaine during the criminal episode.

■■■■ We have made it unequivocally clear that under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) prosecutors have an affirmative duty to disclose all material, exculpatory evidence to the defense. *See Ex parte Kimes,* 872 S.W.2d 700, 702 (Tex.Cr.App.1993). *See also Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490, 505 (1995). However, the prosecution has no duty to turn over evidence that would be inadmissible at trial. *Id.* at 703 (citing to *Iness v. State,* 606 S.W.2d 306, 310 (Tex.Cr.App.1980)). In Section III–A above, we announced that Rule of Criminal Evidence 608(b) prohibits the use of inchoate prior drug use including "nebulous withdrawal symptoms" for impeachment. *See* Section III–A, *supra.* Thus, Pamela Lloyd's state-

ment was inadmissable at trial, and the prosecution was under no duty to disclose it.

■■■■ Moreover, even if we assume that the statement was admissible, appellant fails to establish reversible error. Under our existing law, the defendant bears the burden of showing materiality. *Amos v. State,* 819 S.W.2d 156, 159–60 (Tex.Cr.App.1991), *cert. denied,* 504 U.S. 917, 112 S.Ct. 1959, 118 L.Ed.2d 561 (1992). An appellant can show that evidence withheld by a prosecutor is material only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the outcome of the proceeding would have been different." *Kimes,* 872 S.W.2d at 702. To establish a "reasonable probability," the likelihood of a different outcome must be sufficient to undermine the outcome of the trial. *Id.* We must evaluate the materiality of exculpatory evidence in light of the entire record. *Turpin v. State,* 606 S.W.2d 907, 916 (Tex.Cr.App.1980).

In this case, Pamela Lloyd was able to identify the defendant by his voice based upon a six-year relationship and numerous telephone conversations. Appellant contends that Pamela Lloyd's statement was both exculpatory and material—that is, sufficient to undermine the outcome of the trial. However, the statement's temporal and logical context contradict appellant's attempted connection with Pamela Lloyd's identification of the defendant. The statement was, first of all, made several days after the crime, not immediately following the crime. More importantly, Pamela Lloyd made the statement in response to questioning about her personal reactions to the crime, not to questioning about alleged drug withdrawal or perceptual impairment. Therefore, Pamela Lloyd's statement qualifies as nothing more than a post-crime expression of grief for the purposes of establishing the crime's impact on a living victim—precisely the purpose of a victim impact statement.

Additionally, two other witnesses—Pamela Lloyd's son Charles, and Pamela Lloyd's uncle, Dempsey Lloyd—positively identified appellant as the perpetrator of the instant offense. Appellant has, in short, failed to carry his burden of persuasion as to materiality by establishing a reasonable likelihood

of a different outcome. Consequently, the defense has absolutely no basis to demand a new trial. *Id.* at 702–03. Appellant's fifteenth and sixteenth points of error are accordingly overruled.

## VI.

■ In point of error seventeen, appellant asserts that the trial court erred by refusing appellant's challenge for cause of venireman David Conner who stated that he could not consider good behavior while in jail or prison as possible mitigation evidence. Our standard for granting the defense's challenges for cause based on veniremembers' attitudes is set out in Article 35.16(c)(2) of the Code of Criminal Procedure:

> "[A veniremember must have] a bias or prejudice against any of the laws applicable to the case upon which the defense is entitled to rely, either as a defense to some phase of the offense for which the defendant is being prosecuted, or as a mitigation thereof or of the punishment therefor."

TEX.CODE CRIM. P. ANN. art. 35.16(c)(2) (Vernon's 1995). When we are asked to review a challenge for cause based upon a veniremember's alleged bias against the law, we must determine whether the veniremember's beliefs would prevent or substantially impair him from following the law as set out in the trial court's instructions and as required by the juror's oath. *Pierce v. State,* 777 S.W.2d at 399, 404 (Tex.Cr.App.1989), *cert. denied* 496 U.S. 912, 110 S.Ct. 2603, 110 L.Ed.2d 283 (1990). Additionally, we must show great deference to the trial court's rulings on challenges for cause. *Id.*

■ The law does not, however, require that jurors attach significance to potentially mitigating evidence. *Robertson v. State,* 871 S.W.2d 701, 711–12 (Tex.Cr.App. 1993). Indeed, we allow jurors to formulate their own opinions as to which evidence is mitigating and which evidence is unimportant. *Id.* "The constitution only requires that where a juror believes there is relevant mitigating evidence, that juror must have a vehicle to give his or her reasoned moral response to such evidence." *Id.* Accordingly, we hold that the trial court did not abuse its discretion by determining that appellant failed to establish the requisite "bias against the law" with David Conner's refusal to give mitigatory import to good prison behavior. Appellant's seventeenth point of error is overruled.

## VII.

In point of error nineteen, appellant argues that the trial court erred by allowing Dr. Coons, a fully qualified psychiatrist, to draw conclusions over timely objection about the issue of future dangerousness within a prison population. Appellant's claim, therefore, boils down to an assertion that a fully competent psychiatrist is not qualified to express opinions regarding future dangerousness in a prison context. We find this position untenable.

■ We begin our analysis by noting that the trial court's judgment regarding experts' qualifications and the admissibility of expert testimony is subject to an abuse of discretion standard of review. *McBride v. State,* 862 S.W.2d 600, 607–08 (Tex.Cr.App. 1993), *cert. denied* 512 U.S. 1246, 114 S.Ct. 2765, 129 L.Ed.2d 879 (1994); *Joiner v. State,* 825 S.W.2d 701, 708 (Tex.Cr.App.1992), *cert. denied,* 509 U.S. 925, 113 S.Ct. 3044, 125 L.Ed.2d 729 (1993). In this case, the trial court was able to rely on Dr. Coons' professional qualifications—Dr. Coons is a medical doctor specializing in psychiatry who has a law degree and extensive professional experience as an expert witness in both capital and noncapital cases—to justify the admission of the contested future dangerousness testimony. These qualifications provided the trial court with a more than adequate basis for admitting Dr. Coons' testimony. *Cf. McBride,* 862 S.W.2d at 607–08 (upholding trial court's discretion in allowing future dangerousness testimony based on similar psychiatric credentials); *Joiner,* 825 S.W.2d at 708 (utilizing similar psychiatric credentials to uphold trial court's admission of expert testimony about future dangerousness). Indeed, we have recently upheld the "discretion of the trial court" in allowing psychiatrists with similar qualifications to testify about future dangerousness in *McBride* and *Joiner, supra.* Accordingly, we decline to over-

turn the trial court's discretion today; appellant's nineteenth point of error is overruled.

## VIII.

In point of error twenty, appellant alleges that the trial court erred by admitting State's exhibit numbers 70 and 71 into evidence at punishment without a proper showing of the chain of custody. Essentially, appellant contends that although the cocaine evidence contained in these two exhibits was properly identified by the arresting officers, a 31 month storage period and prior test of the cocaine rendered the drugs inadmissible. We disagree.

 Without evidence of tampering, most questions concerning care and custody of a substance go to the weight attached, not the admissibility, of the evidence. *Alvarez v. State*, 857 S.W.2d 143, 147 (Tex.App.—Corpus Christi 1993, *pet. refused*) (relying on *Medellin v. State*, 617 S.W.2d 229, 232 (Tex. Cr.App.1981)). *See also* Tex.R.Crim. Ev. 901(a)(authentication requirements satisfied by "evidence sufficient to support a finding that the matter in question is what its proponent claims"). The cocaine, in this case, was properly identified by the seizing officers under the standard we set out in *Stoker v. State*, 788 S.W.2d 1, 10 (Tex.Cr.App.1989), *cert. denied*, 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 333 (1990) (providing that chain of custody is conclusively proven when the seizing officer testifies: (1) that he seized the physical evidence, (2) that he has identified his personal mark on the evidence, and (3) that he placed into and retrieved the item of evidence from the property room). In the absence of any evidence of tampering, therefore, we see no reason to prohibit the admission of properly identified evidence just because it has been kept in an evidence room for an extended period of time and undergone prior forensic testing. *Cf. Alvarez*, 857 S.W.2d at 147 (dictating that questions of care and custody are credibility issues). Accordingly, appellant's twentieth point of error is overruled.

9. The facts of the case reflect that the criminally culpable party raped and impregnated one of the victims of the crime, and was motivated to kill

## IX.

In point of error twenty-one, appellant argues that the trial court erred by overruling appellant's objection to an improper reputation question by the prosecutor. Specifically, appellant complains that the trial court allowed the prosecutor to convert a permissible reputation inquiry into a prohibited inquiry into specific bad acts by asking whether the witness' opinion was based on information provided by "young girls"—that a reference to "young girls" in the context of the crime constituted an impermissible reference to unproven specific instance of conduct.[9] *See* Tex.R.Crim. E. 405 (prohibiting specific conduct evidence with character witnesses).

 During the punishment phase of trial the State called the last of several police officers to testify that appellant's reputation for being peaceful and law-abiding was bad. After the officer testified on cross-examination that he had never arrested appellant, the State elicited the following testimony:

Q: [PROSECUTOR]: Although you have not made an arrest of this defendant, do you base your opinion as to his reputation on informant information and on talking to other individuals?

A: Informant information and other officer information.

Q: Have you ever talked to young girls about his reputation?

A: Yes, I have.

[PROSECUTOR]: We'll pass the witness.

[DEFENSE ATTORNEY]: We're going to object to any further questioning or questioning in those last two lines as being outside the scope of reputation testimony.

THE COURT: He has already passed the witness. I assume he is through.

[DEFENSE ATTORNEY]: Okay, but I object to those last two questions..

THE COURT: Overruled.

[DEFENSE ATTORNEY]: Nothing further.

THE COURT: You may step down.

the rape-victim and several of her family members to avoid charges for his conduct.

A defendant must make a timely objection in order to preserve error in the admission of evidence. Rule 52(a), Tex.R.App.Proc.; *Dinkins v. State*, 894 S.W.2d 330, 355 (Tex.Cr. App.1995). An objection should be made as soon as the ground for objection becomes apparent. *Id.* If a defendant fails to object until after an objectionable question has been asked and answered, and he can show no legitimate reason to justify the delay, his objection is untimely and error is waived. *Id.*

Appellant did not object until the prosecutor's question had been asked and answered, and the prosecutor had passed the witness. The objection was, thus, untimely, and appellant has failed to preserve error. Point of error twenty-one is overruled.

## X.

In points of error twenty-two through twenty-four, appellant attempts to persuade us that the inclusion of the word "probability" in our special issues on capital punishment renders our capital sentencing procedure constitutionally invalid. We, however, find appellant's arguments to be unsatisfactory.

### A.

 In point of error twenty-two and twenty-three, appellant attempts to persuade us that his death sentence is invalid because it is based on the jury's application of the vague and indefinite term, "probability;" and consequently that the trial court erred by denying appellant's motion to quash this capital murder indictment. We have consistently held, however, that capital murder juries' utilization of the term "probability" to resolve the special issue of future dangerousness passes constitutional scrutiny for indefiniteness.[10] *Kemp v. State*, 846 S.W.2d 289, 308–09 (Tex.Cr.App.1992), *cert. denied*, 508 U.S. 918, 113 S.Ct. 2361, 124 L.Ed.2d 268 (1993); *Jones v. State*, 843 S.W.2d 487, 496–97 (Tex.Cr.App.1992), *cert. denied*, 507 U.S. 1035, 113 S.Ct. 1858, 123 L.Ed.2d 479 (1993); *Lewis v. State*, 815 S.W.2d 560, 562–63 (Tex.

Cr.App.1991), *cert. denied*, 503 U.S. 920, 112 S.Ct. 1296, 117 L.Ed.2d 519 (1992). Indeed, the United States Supreme Court has affirmed that Texas jurors use of the term "probability" to resolve the issue of future dangerousness passes constitutional muster. *See Jurek v. Texas*, 428 U.S. 262, 274–76, 96 S.Ct. 2950, 2957–58, 49 L.Ed.2d 929 (1976) (asserting that lack of specific definition poses no constitutional vagueness problems). We perceive no need to revisit this well-settled principle of our capital jurisprudence. Appellant's twenty-second and twenty-third points of error are consequently overruled.

### B.

In point of error twenty-four, appellant contends that his conviction is invalid because it is based on the jury instruction on future dangerousness contained in Article 37.071(b)(2); an instruction which impermissibly decreases the State's burden of proof from beyond a reasonable doubt to a mere probability by including the term "probability". Once again, we must refer appellant to a long line of our prior cases holding that the inclusion of the term "probability" in the future dangerousness special issue of capital trials does not impermissibly soften the required burden of proof in criminal cases. *Robison v. State*, 888 S.W.2d 473, 481–82 (Tex.Cr.App.1994); *Kemp v. State* 846 S.W.2d 289, 309 (Tex.Cr.App.1992), *cert. denied*, 508 U.S. 918, 113 S.Ct. 2361, 124 L.Ed.2d 268 (1993); *Jones v. State*, 843 S.W.2d 487, 496 (Tex.Cr.App.1992), *cert. denied*, 507 U.S. 1035, 113 S.Ct. 1858, 123 L.Ed.2d 479 (1993); *Sosa v. State*, 769 S.W.2d 909, 916–17 (Tex.Cr.App.1989). Appellant's twenty-fourth point of error is accordingly also overruled.

### XI.

In point of error twenty-five, appellant argues that the trial court erred during punishment by overruling the defense's timely objection to harmful prosecutorial arguments which were outside the record. More particularly, appellant asserts that the prosecu-

---

**10.** The special issue on future dangerousness was codified under Article 37.071(b)(2) of the 1990 version of the Texas Code of Criminal Procedure under which appellant was sentenced. *See* n. 2, *supra*.

tion's closing argument expressly included a statement which was outside the record—that "drugs and violence are a part of prison life." Appellant claims that the trial court's refusal to sustain the defense's timely objection to this statement constitutes harmful error which requires a reversal and remand of appellant's conviction.

■■■ We have recognized and deemed permissible the following four areas of jury argument: (1) summations of the evidence; (2) reasonable deductions from the evidence; (3) responses to the defendant's argument; or (4) a plea for law enforcement. *Gaddis v. State,* 753 S.W.2d 396, 398 (Tex.Cr.App.1988). In order to assess the validity of appellant's claims, therefore, we must first look to the record to determine if any evidence was presented which would support the prosecution's statement. First, we will look to the record for evidence supporting the prosecution's reference to prison violence. The State directs our attention to the direct examination of the State's psychiatrist, Dr. Richard Coons,[11] and the cross-examination of the defense's psychologist, Dr. Richard Schmitt.[12] The State asserts, and we agree, that the prosecution's reference to prison violence qualifies as an permissible summation of the evidence. *Gaddis,* 753 S.W.2d at 398.

■■■ Turning now to the reference to drugs in prison, however, the State remains unable to provide an evidentiary foundation in the record for the prosecution's argument. Instead, the State relies on an exception to the permissible types of closing argument for matters outside the record which are common knowledge. *Sawyers v. State,* 724 S.W.2d 24, 37 (Tex.Cr.App.1986); *Carter v. State,* 614 S.W.2d 821, 823 (Tex.Cr.App.1981). We do not find the State's argument persuasive; prison drug use is simply not a matter of common knowledge. Thus, the trial court erred by overruling the appellant's objection to the prosecution's referencing of prison drug use.

■■■ However, every inappropriate remark made during closing arguments does not require the reversal of a conviction. *Hernandez v. State,* 819 S.W.2d 806, 820 (Tex.Cr.App.1991), *cert. denied,* 504 U.S. 974, 112 S.Ct. 2944, 119 L.Ed.2d 568 (1992). We must, therefore, proceed with a harm analysis to determine if the appellant's claim merits reversal. The Texas Rules of Appellate Procedure define harmless error as any error, which the reviewing appellate court determines beyond a reasonable doubt, made no contribution to the appellant's conviction or punishment. Tex.R.App. P. 81(b)(2). We have concluded that this standard requires us to "focus upon the error and determine whether it contributed to the conviction or

11. The relevant testimony of Dr. Richard Coons is as follows:
> *Prosecution:* Doctor, do you have an opinion as to whether that person would be a continuing threat to society even if you define society as a prison system?
> *Dr. Coons:* Yes.
> *Prosecution:* What is your opinion, sir?
> *Dr. Coons:* It is my opinion that there is a probability that that person would pose a continuing threat to society through violent acts.
> *Prosecution:* How does that your—how does your—how does that include or exclude whether or not he spends time in the penitentiary?
> *Dr. Coons:* Well, the penitentiary is known for violence. There are many violent acts that occur there. It's sort of an intimidating, in-your-face kind of situation; and people are—that's one of the mediums of exchange is intimidation, humiliation, and so forth.

12. The relevant portion of Dr. Schmitt's cross-exam is as follows:

> *Prosecution:* Are you aware of prison violence?
> *Dr. Schmitt:* Am I aware that it exists.
> *Prosecution:* Yes.
> *Dr. Schmitt:* Yes, sir.
> *Prosecution:* People get killed in the penitentiary, don't they?
> *Dr. Schmitt:* They do.
> *Prosecution:* By people capable of violence?
> *Dr. Schmitt:* Yes, sir.
> *Prosecution:* And the prison environment and the guards don't—can't possibly stop it can they?
> *Dr. Schmitt:* No, sir, not 100 percent.
> *Prosecution:* People get humiliated in the penitentiary. That's not some wonderful place where everyone is glorified or held up, is it?
> *Dr. Schmitt:* No, it isn't.
> *Prosecution:* People are capable of being humiliated there just as they are capable of being humiliated, or insulted, or provoked in our society; isn't that true?
> *Dr. Schmitt:* They are.

the punishment." *Harris v. State,* 790 S.W.2d 568, 585 (Tex.Cr.App.1989). To focus on the error, moreover, we must look to the following factors for guidance: (1) the source of the error, (2) the extent to which the error was emphasized by the State, (3) the nature of the error, (4) the probable collateral implications of the error, (5) the weight which a juror is likely to attach to the error, and (6) the extent to which declaring the error harmless will encourage repetition of the error. *Id.* at 587.

Accordingly, we begin our analysis by observing that the error was a side comment made during the prosecution's penalty phase closing argument. The error, therefore, originated in the prosecution's closing argument, was confined to a single comment within that argument, and can be fairly characterized as nothing more than a side comment. Furthermore, the use of drugs in prison is, at best, tangentially relevant to the issue of future dangerousness. Thus, we can realistically surmise that the jury afforded the error little to no weight, and consequently that the collateral effects of the error, including the incentive for repetition, were inconsequential.

Moreover, we "must calculate the probable impact of the error on the jury in light of the existence of the other evidence...." *Orona v. State,* 791 S.W.2d 125, 130 (Tex.Cr.App. 1990). Indeed, "the impact of the error cannot be properly evaluated without examining its interaction with other evidence." *Harris,* 790 S.W.2d at 586. In this case, the prosecution presented an overwhelming body of "other evidence" which supported an affirmative finding on the special issue of future dangerousness—the prosecution's evidence showed a man who carefully planned a brutal killing spree which included not only the ten-year-old victim of his own multiple rapes and his own unborn child, but also several live-in-relatives: two helpless, elderly women and an the uncle who happened to answer the door.

We conclude, therefore, that the trial court's failure to sustain the defense's timely objection failed to negatively effect the jury's assessment of punishment; the trial court's error was harmless. Consequently, the appellant's twenty-fifth point or error is overruled.

### XII.

 In point of error twenty-six, appellant maintains that Article 37.071(g) of the Texas Code of Criminal Procedure is unconstitutional because it minimizes the importance of the death sentence by injecting the constitutionally required special issues of our capital sentencing procedure with misleading information.[13] In particular, appellant complains that Article 37.071(g) effectively nullifies jurors' ability to make informed decisions about life versus death by concealing the import of their answers to special issues concerning the death penalty. We have held, however, that Article 37.071(g)'s prohibition on informing the jury about the effects of their answers to the special issues regarding the death penalty only poses a constitutional problem when the jury is led to believe that they do not have ultimate responsibility for punishment. *Hathorn v. State,* 848 S.W.2d 101, 124–25 (Tex.Cr.App.1992), *cert. denied,* 509 U.S. 932, 113 S.Ct. 3062, 125 L.Ed.2d 744 (1993). Moreover, in the absence of a misrepresentation about responsibility for punishment, we have consistently affirmed the constitutional validity of Article 37.071(g). *Moreno v. State,* 858 S.W.2d 453, 459–61 (Tex.Cr.App.), *cert. denied,* 510 U.S. 966, 114 S.Ct. 445, 126 L.Ed.2d 378 (1993); *Rousseau v. State,* 855 S.W.2d 666, 686–87 (Tex.Cr. App.), *cert. denied,* 510 U.S. 919, 114 S.Ct. 313, 126 L.Ed.2d 260 (1993); *Hathorn,* 848 S.W.2d at 124–25. We, therefore, decline this invitation to overturn our established precedents by overruling appellant's final point of error.

### XIII.

In light of our careful consideration and rejection of appellant's twenty-six points of error, we affirm the judgment of the trial court.

13. Please note, the defendant was sentenced under the 1990 version of Article 37.071. *See* n. 2, *supra.*

BAIRD, Judge, concurring.[1]

I concur in the disposition of points of error five and six.

In *Soria v. State*, 933 S.W.2d 46, (Tex.Cr. App.1996), this Court recognized that in *limited* circumstances a defendant might waive his Fifth Amendment rights—by presenting the testimony of an expert who had conducted a psychiatric examination of the defendant. The Court took pains to explain that only by *presenting the testimony of his own expert* does a defendant "constructively testify" and thereby subject himself to examination by the State's psychiatric expert. *Soria*, 933 S.W.2d at 57–58. Actual presentation of testimony by the defendant is necessary to effect a waiver of Fifth Amendment rights because *until such testimony is presented* it cannot be said that the defendant has *constructively testified.* As explained, "introduction by the defense of psychiatric testimony based upon an examination of the defendant 'constitute[s] a waiver of the defendant's fifth amendment privilege *in the same manner as would the defendant's election to testify at trial.*'" *Id.,* at 54 (quoting *Battie v. Estelle,* 655 F.2d 692, 701–702 (5th Cir.1981)). Merely initiating or expressing an intent to initiate a psychiatric evaluation does not amount to constructive testimony.

The Court has today "decided that it is necessary to employ a sort of 'legal fiction' ... once [a defendant] has indicated an intent to present future dangerousness testimony." *Ante,* at 611. Accordingly, the Court holds that "when the defense demonstrates the intent to put on future dangerousness expert testimony, trial courts may order defendants to submit to an independent, state-sponsored psychiatric exam prior to the actual presentation of the defense's expert testimony." *Id.* The Court justifies this holding by rationalizing that "[p]rohibiting the trial court from ordering a psychiatric exam until after the defense has actually presented his own expert testimony is bound to work against the State in almost every case." *Ante,* at 611. I cannot agree we should ignore invocation of a defendant's constitutional rights because recognizing them

"works against the State in almost every case."

However, the majority offers some further explanation to support its holding: "Our sense of justice will not tolerate allowing criminal defendants to testify through the defense expert and then use the Fifth Amendment privilege against self-incrimination to shield themselves from cross-examination on the issues which they have put in dispute." *Ante,* at 611. While this explanation may support the holding in *Soria,* it plainly does not support its holding in this case where the defendant has *not* "testified through the defense expert" and the defendant has *not* put any "issues ... in dispute" because the defense expert has not testified. While the Court cites dicta from several cases in support of its holding, none of the cases cited *hold* as the Court holds today.

Therefore, the trial court erred in ordering appellant to submit to an examination by the State's expert when appellant had not yet waived his Fifth Amendment rights by presenting psychiatric evidence of his own. *Soria, supra.* Accordingly, a harm analysis is appropriate. Tex.R.App. P. 81(b)(2).

In assessing harm under Rule 81(b)(2), the following factors should be considered: (1) the source of the error; (2) the nature of the error; (3) whether and to what extent the State emphasized the error; (4) any collateral implications of the error; (5) the weight a juror would probably place upon the error; and (6) whether declaring the error harmless would encourage the State to repeat it with impunity. *Harris v. State,* 790 S.W.2d 568, 587 (Tex.Cr.App.1989).

The source of the error was the trial court's order. Pursuant thereto, the State's expert attempted to conduct a psychiatric examination of appellant to assess appellant's future dangerousness for purposes of testifying at punishment. However, appellant refused to cooperate. Accordingly, in rebuttal of the defense expert who testified that he had examined appellant and concluded that he would not be a future danger, the State's expert testified that he had attempted to

1. This opinion was prepared by Judge Frank Maloney prior to his leaving the Court.

examine appellant but appellant had not co-operated. He then testified based on a hypothetical. Appellant's failure to cooperate with the State's expert prevented the expert from drawing any conclusions based on an examination of appellant.

At the outset of his testimony, the State asked its expert about appellant's lack of cooperation with his examination.[2] After that initial inquiry, the State did not again mention the attempted examination in questioning the expert. The State did not even refer to its expert's testimony in its closing argument. The State asked the jury to assess an affirmative finding of future dangerousness based on the facts of the case and appellant's prior conduct. While appellant's failure to cooperate in the examination might have been viewed negatively by the jury, it was not emphasized by the State.

In assessing punishment the jury considered all the evidence at guilt/innocence, as well as the punishment phase evidence. The following evidence was before the jury at punishment:

1. Appellant had sexual intercourse with the ten-year-old victim on multiple occasions, resulting in the victim's pregnancy.

2. The morning after being informed that the sexual assault charges against appellant would not be dropped, appellant went to the residence with a double-barrel shotgun and brutally murdered the ten-year-old victim, her two great aunts, and shot and injured her uncle.

3. Appellant was previously convicted of murder in 1977 and was sentenced to twenty years.

4. Two police officers testified that they had observed appellant dealing cocaine.

5. Two women testified that appellant had forced them at gunpoint to remove their clothing, had tied them up and attempted to perform oral intercourse on them.

6. Numerous police officers testified to appellant's bad reputation.

Even if the jury might have viewed appellant's lack of cooperation with the State's expert as inculpatory, the other evidence supporting an affirmative finding on future dangerousness dissipated the effect of that evidence. In other words, evidence that appellant did not cooperate with a State's expert fades to insignificance when compared to other evidence of appellant's behavior indicative of future dangerousness.

In addition, at the time of the trial court's order, it did not have the benefit of this Court's opinion in *Soria*. *Soria* clearly sets forth the circumstances in which a defendant is deemed to have waived his Fifth Amendment rights by introducing psychiatric testimony. In light of the dictates of *Soria* it is unlikely that the State would continue to ask the trial court to order an evaluation by the State's expert prior to introduction of such evidence by a defense expert (were it not for the Court's holding today).

Considering these factors, I find beyond a reasonable doubt the trial court's error in ordering the defendant to submit to an examination by the State's expert was harmless in that it did not contribute to the punishment assessed. Accordingly, I concur in the disposition of points of error five and six and, therefore, join only the judgment of the Court.

MEYERS, J., joins this opinion.

OVERSTREET, Judge, concurring.

I disagree with the majority's discussion regarding appellant's points of error num-

---

**2.** The following exchange occurred:

[Prosecutor]. And were you able to interview the Defendant and evaluate the Defendant?
[State's expert]. I spoke with [appellant] about 30 minutes, and he gave me some basic information ... but he basically declined to be evaluated.
Q. Did you inquire as to why he didn't want to be evaluated?
A. I did.

\* \* \* \* \* \*

Q. What did he tell you as a reason for not being willing to be evaluated?
A. That I was hired by the prosecution and probably would not be fair and that it was unlikely my evaluation would help him.

bers five and six wherein he complains of the trial court ordering him to be examined by the State's psychiatrist. However, because appellant in fact was allowed to present his expert testimony in spite of his refusal to succumb to the State's psychiatrist's efforts to interview him, I concur with the disposition of the points.

As I indicated in my recent dissent to this Court's treatment of the same issue in *Soria v. State*, 933 S.W.2d 46, 71 (Tex.Cr.App.1996) (Overstreet, J., dissenting), there is no constitutional or statutory legal authority for forcing a defendant to submit to interrogation by a State-sponsored psychiatrist so that the State can make its future dangerousness case against the defendant at punishment. The majority continues to disregard this Court's holding in *Bradford v. State*, 873 S.W.2d 15 (Tex.Cr.App.1993)(plurality opinion of the Court), *cert. denied*, 513 U.S. 925, 115 S.Ct. 311, 130 L.Ed.2d 274 (1994). In fact, the majority now, in derogation of the *Bradford* opinion of the Court, citing the dissenting opinion in *Bradford*, states that its "sense of justice will not tolerate allowing criminal defendants to testify through the defense expert and then use the Fifth Amendment privilege against self-incrimination to shield themselves from cross-examination on the issues which they have put in dispute." *Lagrone v. State*, 942 S.W.2d 602, 611. Yet in this case, appellant did not testify—he did not take the stand to testify in his defense. This Court has even held that out-of-court statements do not constitute "testimony" such as to require corroboration. *Bingham v. State*, 913 S.W.2d 208 (Tex.Cr. App.1995)(op. on reh'g). Yet the majority states that even though appellant did not present in-court "testimony" he is still subject to cross-examination. Thus, in light of such reasoning, would the majority approve of the State having called appellant personally as a witness and forced him to be cross-examined before the jury based simply upon him presenting a defense at punishment? Surely, such forced cross-examination would be intolerable, wouldn't it? Is not forced cross-examination by the State-sponsored expert psychiatrist likewise intolerable?

And now, the majority goes even beyond *Soria* and authorizes trial courts to order defendants to submit to State-sponsored psychiatric exams on future dangerousness when the defendant even *"plans to introduce"* his own future dangerousness expert testimony. *Lagrone, supra*, 942 S.W.2d at 611 (emphasis in original). Just how one determines in advance whether a defendant "plans to introduce" such evidence is not specified. Is the defendant required to file some pre-trial, or pre-punishment, motion? Or is the defendant required to submit to interrogation about whether he even "plans to introduce" such evidence? Or does a defendant's shifty scheming eyes provide such a basis for concluding that he "plans to introduce" such evidence? We can only wonder; but it certainly appears pursuant to the majority's reasoning and attitude that potentially each and every capital defendant can be ordered to submit to an interrogation by a State's psychiatric expert because each and every capital defendant could choose to proffer their own expert psychiatric evidence at punishment. Is this what the majority intends—that all capital defendants be compelled to submit to an interrogation and interview with a State's psychiatric expert so that the State can present the evidence obtained from such interview and interrogation in proving up the special issues? As noted above, there is no constitutional or statutory legal authority for forcing a defendant to submit to such interrogation and interview for the State to make its case against the defendant on the special issues at punishment.

Likewise, there is no constitutional or statutory legal authority for sanctioning a defendant who refuses to submit to interrogation by a State sponsored psychiatrist by precluding the defendant from presenting his own expert's testimony. Such sanction denies the defendant his right to present witnesses with relevant information for his defense. The defendant's right to present his own witnesses to establish a defense is a fundamental element of due process of law. *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019, 1023 (1967). The right to offer testimony of witnesses and the right to present a defense is the right to present the defendant's version of the facts

as well as the prosecution's so that the jury may decide where the truth lies. *Id.* This right is especially critical at punishment in a capital murder case where the issues are literally *matters of physical life and death.* To preclude and forbid a defendant from presenting evidence that is indisputably relevant to the potentially lethal special issues that the jury has to answer simply because he chooses to exercise his constitutional rights to silence is the epitome of imprudence.

Nevertheless, as the majority points out, the trial court did indeed allow appellant to present testimony from his expert, Dr. Schmitt. *Lagrone, supra,* 942 S.W.2d at 610. Thus he was not precluded from presenting his expert testimony based upon his refusal to comply with the order to be interviewed by the State's expert.[1] And that State's expert did testify as to appellant's future dangerousness without the benefit of appellant submitting to the forced interview. Thus the State was able to make its case on future dangerousness and convinced the jury to return a verdict resulting in assessment of the death sentence, without appellant submitting to the forced interview. As the United States Supreme Court said in *Estelle v. Smith,* 451 U.S. 454, 468, 101 S.Ct. 1866, 1876, 68 L.Ed.2d 359, 373 (1981), "the State must make its case on future dangerousness in some other way[,]" and in the instant cause, the State obviously was *quite* able to make its case on future dangerousness in some other way, i.e. without appellant submitting to the forced interview.

Because the majority continues to preach so as to abridge the Texas Constitution's and the United States Constitution's Bill of Rights' Fifth Amendment privileges against self-incrimination and the due process right to present a defense, I respectfully dissent to the discussion contained in points five and six. However, because the trial court did allow appellant to present testimony from his

expert, Dr. Schmitt, I concur in overruling points five and six.

Otherwise, I concur only in the judgment.

---

1. In fact, since there was no preclusion of appellant's presentation of Dr. Schmitt's testimony, the entirety of the majority's discussion about such preclusion being an appropriate sanction for not submitting to a forced and compelled interrogation by a State's psychiatric expert appears to be utter obiter dictum.