# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00258-CR

**Leif Bothne, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT
### NO. D-1-DC-2005-904054, HONORABLE JON N. WISSER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Leif Bothne guilty of murder, and the district court assessed his punishment at thirty-eight years' imprisonment. *See* Tex. Penal Code Ann. § 19.02 (West 2003). Appellant contends that the State violated his rights to due process and due course of law by failing to disclose exculpatory evidence and by displaying a photograph of the deceased on the prosecutor's table during the trial. He also urges that the trial court violated his constitutional confrontation right by limiting his cross-examination of a State witness. Finding no reversible error, we affirm the conviction.

## BACKGROUND

Appellant fatally shot Richard Midkiff (who was referred to throughout the trial as R.J.) during an altercation outside the Austin apartment Midkiff shared with Gracey Vanderven and

their infant daughter. Through a middleman who lived in another apartment at the same complex, Midkiff had agreed to sell a quantity of cocaine to appellant and his friend Nathan Brown on the afternoon of April 5, 2004. But when appellant and Brown arrived at the appointed time, Midkiff, still dealing with the middleman, reneged on the deal. Informed of Midkiff's refusal to sell the cocaine, appellant and Brown went to Midkiff's apartment to personally confront him. Before doing this, Brown returned to his truck and armed himself with a pistol "because I didn't know . . . what it was going to escalate into."

Brown, who at the time of appellant's trial was also under indictment for murder, testified that Midkiff opened his apartment door in answer to appellant's knock and immediately "jumped in [appellant's] face." Appellant and Midkiff "bumped chests" and began to argue. Brown noticed that Midkiff "was messing with something in his pants." He said that Midkiff "was doing like this in his pocket like he had something—like he was going to pull something out." Midkiff's hand did not leave his pocket, however. Brown intervened in the argument and asked, "Are y'all going to fight or what?" Midkiff told Brown, "Stay out of this, Bitch." With that, Brown pulled out his pistol, handed it to appellant, and began hitting Midkiff. Brown said that as he and Midkiff wrestled, he felt a sharp pain in his chest. Brown would later discover that he had been stabbed several times.

As Brown and Midkiff fought, Vanderven grabbed Brown from behind and began hitting him. This struggle was taking place in the walkway in front of Midkiff's second-floor apartment, and at some point Midkiff and Brown fell down the stairs onto a landing. Brown testified that when he and Midkiff regained their footing, Midkiff turned away from him and began to walk

up the stairs toward appellant, who was still standing outside the apartment. Brown said that he did not see appellant shoot Midkiff, but he heard the shot as he was examining his wounds.

Appellant did not testify. His defense, asserted through counsel's argument and questioning of the State's witnesses, was that he shot Midkiff in self-defense and in defense of Brown, and the jury was appropriately instructed regarding these defenses. Apparently unpersuaded by the defense, the jury convicted appellant of murder.

**FAILURE TO DISCLOSE**

In his first point of error, appellant contends that the State violated his due process rights by failing to disclose material exculpatory evidence. The evidence in question concerned the kitchen scissors that were found lying on the walkway outside Midkiff's apartment following the shooting. It was undisputed at trial that these scissors were used to stab Brown during the fracas. Vanderven testified that the scissors were part of a knife set she kept in the kitchen. She said that Midkiff went to the kitchen immediately before answering appellant's knock on the door, but she claimed that she never saw the scissors in Midkiff's hand. One of the investigating officers testified, however, that Vanderven told him and another officer that she saw Midkiff pick up the scissors before going outside to confront appellant and Brown.

Appellant complains that the State failed to disclose the fact that another resident of the apartment complex who witnessed the fight, Tonya Alleman, had seen Vanderven holding the scissors. Alleman, who testified at the trial, said that Vanderven "was coming down [with the scissors] in like a—motion." Alleman answered affirmatively when asked if Vanderven had

3

held the scissors "as you might expect somebody who has either stabbed somebody or was going to stab somebody."

Defense counsel voiced no objection during Alleman's testimony. Before testimony resumed the following day, however, counsel told the court that "yesterday there was a potential violation of Brady." *See Brady v. Maryland*, 373 U.S. 83 (1963). Counsel complained that the offense reports disclosed to the defense prior to trial had contained no mention of Alleman having seen Vanderven with the scissors, and that the defense had first heard of it when Alleman testified. The prosecutor explained that she first learned that Alleman had seen Vanderven holding the scissors when Alleman mentioned this fact during a telephone conversation one month before the trial began.[1] The prosecutor immediately sent an officer to conduct a second interview of Alleman, and the officer prepared a supplemental report dated March 1, 2005 (appellant's trial began on March 28). On March 15, the prosecutor sent defense counsel a letter, admitted in evidence, that did not mention Alleman or the officer's supplemental report, but did tell counsel, "If there are any other items that you need, please let me know." The prosecutor told the court that this "was basically inviting [counsel] to come and get discovery." At the conclusion of the discussion, the trial court said that whether or not the information was exculpatory, "the defense is now aware of it and have plenty of time to do whatever they need to meet or to utilize it."

Under *Brady*, a prosecutor has an affirmative duty to disclose any material, exculpatory evidence. *Id.* at 87. Evidence is exculpatory if it tends to excuse or clear the defendant

---

[1] Alleman testified that she told investigators on the day of the shooting that she had seen Vanderven with the scissors. This fact was not in the original offense reports.

4

from guilt. *Riley v. State*, 953 S.W.2d 354, 359 (Tex. App.—Austin 1997, pet. ref'd). Exculpatory evidence also includes impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985). Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the outcome of the proceeding would have been different. *Id*. at 682. Appellant argues that the evidence that Vanderven was seen holding the scissors and making stabbing motions tended to support his self-defense and defense of third party claims and, had it been timely disclosed, would have been an effective tool during his cross-examination of Vanderven. Appellant urges that there is a reasonable probability that the outcome of his trial would have been different had the State timely disclosed what Alleman had seen.

When exculpatory evidence is not disclosed until after trial has begun, the issue is whether the tardy disclosure prejudiced the defense. *Little v. State*, 991 S.W.2d 864, 866 (Tex. Crim. App. 1999). If the evidence was turned over in time for the defense to make use of it, a *Brady* claim will fail. *Id*. In the instant case, appellant knew before his trial began that Brown had been stabbed during his struggle with Midkiff, that the scissors, with Brown's DNA on them, had been found lying near the scene of the shooting, and that Vanderven had been seen hitting Brown. Based on this evidence, appellant had formulated his justification defense and advanced that defense at trial.[2] In other words, this is not a case in which the State failed to timely disclose the only evidence

---

[2] Defense counsel discussed self-defense and defense of third persons during jury selection. During his opening statement, counsel told the jury, "What's going to be dispositive of the case is the fact that he had the right to do this because R.J. was stabbing Nathan Brown." Counsel adduced testimony from the investigating police officers that the scissors in question were capable of causing death or serious bodily injury, and that the officers would believe themselves justified in using deadly force if they were attacked by a person wielding the scissors or saw another officer being attacked in that manner.

5

supporting a viable defensive theory. Even before Alleman testified, there was evidence supporting appellant's claim that he shot Midkiff in defense of himself and Brown, and Alleman's testimony merely added further weight to that defense. Alleman's testimony may have come as a surprise to the defense, but it did not prejudice the defense. To the contrary, it supported appellant's assertion that the shooting was justified.

Appellant complains that because Alleman testified after Vanderven, he was not able to use Alleman's information to impeach Vanderven during cross-examination. But defense counsel had asked Vanderven if she stabbed Brown with the scissors, and she had denied it. Alleman's subsequent testimony thus did serve to impeach Vanderven. Had defense counsel believed that it was necessary under the circumstances to confront Vanderven with Alleman's statement, he could have asked to recall her for further questioning.

We hold that insofar as the State was guilty of having failed to timely disclose Alleman's exculpatory information, the outcome of the trial was not effected and the error was harmless beyond a reasonable doubt. *See* Tex. R. App. P. 44.2(a). Point of error one is overruled.

## LIMITATION OF CROSS-EXAMINATION

Appellant contends that the trial court violated his Sixth Amendment confrontation right by improperly limiting his cross-examination of Vanderven. Specifically, appellant argues that he was not allowed to adequately cross-examine Vanderven regarding the presence, at the time of the shooting, of a third adult, Thaddeus Smith, in the apartment she shared with Midkiff.

A defendant's confrontation right includes the right to conduct all legally proper cross-examination designed to expose a witness's testimonial motivations. *Lagrone v. State*,

6

942 S.W.2d 602, 613 (Tex. Crim. App. 1997). Abrogation of a defendant's right to cross-examine the witnesses against him is a denial of due process of law under the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 405 (1965); *Mendez v. State*, 56 S.W.3d 880, 892 (Tex. App.—Austin 2001, pet. ref'd). A trial court, however, has broad discretion to impose reasonable limits on cross-examination to avoid harassment, prejudice, confusion of issues, and the injection of cumulative or collateral evidence. *Lagrone*, 942 S.W.2d at 613. A trial court exceeds its discretion only when it prohibits a defendant from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness. *Id.*

Vanderven testified during her direct examination by the prosecutor that except for their infant son, she and Midkiff were alone in their apartment when appellant and Brown arrived. Later in her testimony, Vanderven stated that a man named Thaddeus Smith came to the apartment after the shooting and helped her care for Midkiff until the EMS technicians arrived. Without further elaboration, Vanderven answered "yes" when asked by the prosecutor if she knew Smith "before this happened."

During cross-examination, Vanderven testified that Smith was Midkiff's caseworker. She said that Smith had been at the apartment before the shooting, but that he had left the apartment before appellant and Brown arrived. Vanderven soon began to alter her story, however, saying first that Smith was in the apartment when appellant knocked at the door but then left, and then admitting that Smith was in the apartment during the entire incident. Vanderven also admitted that she had deliberately failed to mention Smith's presence in her statements to the police and

prosecutors. Asked by defense counsel why she had done this, Vanderven replied, "[H]e asked me not to say anything."

At this point, defense counsel approached the bench and informed the court that he believed that Smith had been at Midkiff's apartment to purchase drugs. The jury was excused and counsel was permitted to voir dire Vanderven on this issue. Vanderven said that Smith was Midkiff's juvenile caseworker and had visited the apartment on several occasions. She said that Midkiff had told her that Smith used cocaine, but she denied any knowledge of whether Midkiff had supplied Smith with drugs. She also denied ever seeing Smith use drugs. She said that Smith had come to the apartment because he and Midkiff were going to go somewhere together; she claimed not to know where they were going or what they were going to do. Finally, she said that she did not know why Smith had asked her not to reveal that he had been present. She had complied with his request because she was "scared."

At the conclusion of the voir dire, defense counsel urged that they should be allowed to cross-examine Vanderven before the jury concerning Smith's relationship with Midkiff and the reason for Smith being at the apartment on the afternoon of the shooting. The court disagreed. It ruled that Smith's reason for being at the apartment was a collateral matter irrelevant to the offense on trial, noted that Vanderven did not "appear to be that knowledgeable about what the two people were doing anyway," and said that there was no reason "to go into some fishing expedition." The court ruled, however, that the defense would be permitted to question Vanderven regarding her prior misstatements and why she had made them:

Well, I think you can ask her. I mean, did you say X once upon a time? Yes. And, in fact, Y is true. Yes. Why did you say that? And go into that motivation. That's a relatively limited amount of questioning, but I don't think that's, you know, a 25-minute inquiry into the relationship between the deceased and this Mr. Smith. Now, when Mr. Smith is called—I assume he'll be called as a witness—then it may become relevant, but I don't think it's relevant through this witness. . . . But I still am concerned under Rule 403 about this trial all of a sudden veering off here into some type of trial about what Mr. Smith was doing with the deceased, because I don't think that is particularly relevant.

After the jury returned and Vanderven's cross-examination resumed, she again admitted that her earlier testimony had been false and that Smith had been present at the apartment throughout the events culminating in the shooting. She added that Smith and Midkiff were friends, although Smith was considerably older than Midkiff. She agreed with counsel's suggestion that "somehow or another something drew them together." During redirect examination by the prosecutor, Vanderven said that Smith was a caseworker who visited the apartment from time to time, that he was not on an official visit on the afternoon in question, and that she did not know what he was doing there that day. Finally, during further cross-examination, this exchange with defense counsel took place:

Q      Okay. But [Smith] wasn't—he wasn't at your apartment in a professional basis, was he?

A      No.

Q      Okay. And he wasn't R.J.'s caseworker, was he?

A      At the time?

Q      Right.

A      No.

Q    And, in fact, what he was on that day—or your belief was—is that he was a—he was a buyer.

A    No. No.

Q    That's what you thought.

A    No, I did not say that.

Q    What did you think he was?

A    They hung out. I mean, we played pool. They did things. It wasn't just—you're making R.J. sound like he's just a big drug dealer.

Q    I'm not asking that. I'm asking why a man was there at your apartment in that—

A    I don't know. They were—they hung out. Maybe they were going to hang out. I don't know. I told you that I don't know.

Q    Did you not testify earlier outside the presence of the jury that your impression was or your belief at the time—your perception was that they were going to do a deal?

A    My belief is my opinion. I don't know what they were doing.

Q    Well, that's what I'm asking you: What was your present-sense impression when he was at the apartment? It was that they were going to do a deal.

A    That day? No. I would assume they're probably—that he would have done it in the past or would have done it that day? No, I don't think that they were doing a deal. They were leaving.

As the record makes clear, appellant was permitted to cross-examine Vanderven regarding Smith's reason for being at the apartment on the afternoon of the shooting despite the trial court's ruling to the contrary. Counsel questioned Vanderven regarding Smith's relationship with Midkiff and asked her if Smith had come to the apartment to purchase drugs. Moreover, Smith

was later called as a witness and appellant was permitted to cross-examine him about the same matters. Smith testified that he had come to the apartment to congratulate Midkiff on his successful completion of a training program. He denied being a user of unlawful drugs. He also denied telling Vanderven to keep his presence at the apartment a secret.

Appellant's contention that his cross-examination of Vanderven was unduly limited is without support in the record. All of the matters he sought to explore during cross-examination, he was allowed to explore. Point of error two is overruled.

## DECEASED'S PHOTOGRAPH

In his last two points of error, which he argues together, appellant contends that the trial court violated his due process and due course of law rights by permitting the State to display a photograph of Midkiff at the prosecutor's table.

On the third day of testimony, following the lunch recess, counsel objected that the State "has put State's Exhibit 74, which is a picture of the victim—and they've placed it on their counsel table. It's propped up against a computer monitor and it's facing the jury. This is extremely prejudicial, and the defense would ask that it be removed from the table." The prosecutor responded, "I think we have a right to have the jury see what this victim looked like before the defendant got through with him." The trial court noted for the record that "the State has an eight by ten photo of the deceased displayed on the counsel table. The Court's going to decline to sustain the objection." The court added, "If anyone has any case law on this matter, I'd be happy to review it." Apparently, the photograph remained on display throughout the remainder of the trial, which lasted another two days.

11

The photograph in question appears to be a snapshot. As originally offered by the State, the photograph pictured Midkiff holding his infant son. At appellant's request, the photograph was cropped to remove the child from the picture, and the exhibit was then admitted without further objection. Appellant cites no authority holding that the display of a photographic exhibit such as this is error, much less error of constitutional dimension. The State undoubtedly hoped that the photograph would generate sympathy for the deceased, but there is no evidence that the display of the photograph inflamed the minds of the jury or otherwise unfairly prejudiced appellant. No abuse of discretion is shown, and points of error three and four are overruled.

The judgment of conviction is affirmed.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Pemberton

Affirmed

Filed: April 30, 2008

Do Not Publish

12