TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-09-00100-CR






 

Kevin David Schoff, Appellant



v.



The State of Texas, Appellee






FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 51ST JUDICIAL DISTRICT


NO. A-08-0026-S, HONORABLE JAY K. WEATHERBY, JUDGE PRESIDING






M E M O R A N D U M O P I N I O N



A jury found appellant Kevin David Schoff guilty of aggravated sexual assault of a
child and assessed his punishment at fifteen years' imprisonment. See Tex. Penal Code Ann.
§ 22.021 (West Supp. 2009). Appellant contends that the trial court reversibly erred by admitting
evidence of extraneous sexual conduct and that the evidence as a whole is factually insufficient to
support the finding of guilt. We overrule these contentions and affirm the conviction.


BACKGROUND


Appellant and his wife, Noel Schoff, were married in 1991. They have four
daughters, H.S. (thirteen years of age at the time of trial), M.S. (ten), V.S. (eight), and G.S. (six). 
By all accounts, the marriage was a rocky one. Appellant admitted having a problem controlling his
temper, and there were incidents when he would become so enraged that he would throw objects or
put a fist through a wall. Noel described an occasion when appellant shook her, but there was no
evidence that appellant ever struck Noel or a child. The couple separated on several occasions
during the course of the marriage, with the final separation taking place in June 2006. The girls
continued to live with their mother following this separation.

Noel testified that H.S. began having her own anger management problems in 2006. 
H.S. became increasingly aggressive, both verbally and physically, to her mother and sisters. Noel
took H.S. to counselors, and she ultimately placed H.S. in River Crest Hospital, a mental health
facility in San Angelo. During her two-week stay at River Crest in January 2007, H.S. was
diagnosed with post-traumatic stress disorder.

H.S. made her first sexual abuse outcry on March 19, 2007. Noel testified that she
and the girls were at a friend's house for dinner. She recalled, "[H.S.] was in trouble with me for
lying about something, I don't remember what it was, but she was on the bed and I was talking to
her . . . ." Suddenly, "[H.S.] looked like she was thinking about something else . . . . She seemed
to be off in another thought." Noel asked H.S., "[W]here are you? What is going on?" H.S. said
nothing at first, but she "spun around and she looked at me and she had this look on her face of fear." 
H.S. then began to describe several "scenes" involving appellant. In one, H.S., who had "really,
really bad trouble with diarrhea," needed to be wiped, and "when [appellant] wiped her, he was
angry and he hurt her" by putting his finger in her sexual organ. H.S. also said that when appellant
tickled her, he touched "her upper leg, tickling her, and then he would put his finger up inside her
there, and then there was another time that she was at the mall and she said [appellant] picked her
up and had her facing him and then put her on his shoulders, but before he did that, he did it again."

Noel reported what H.S. had said to the Tom Green County sheriff's department. On
March 27, 2007, H.S. was interviewed by Karla Payne, a forensic interviewer at the Children's
Advocacy Center, also called Hope House. Payne testified that during this interview, H.S. described
two incidents. The first was in the bathroom when she "had some diarrhea and she asked her dad
to come in and wipe her, and . . . he touched her in her period spot." (1) The second was when she and
appellant were playing a "Tickle Monster" game and "he tickled her underneath her clothes and he
touched her again that time." Payne clarified that in these touches, "his finger went inside her."

In April 2007, H.S. began meeting with Y. D. Garcia, a licensed professional
counselor with extensive experience working with sexually abused children. Garcia testified that
during these counseling sessions, H.S. described a time when "she was trying to cuddle with her
mother in bed and her father put his finger in her . . . period spot," another time when appellant was
watching "nasty stuff" on television and "his penis was hanging out," and "a time where . . . she had
gone to bed and her father had inserted a knife into her vagina . . . ."

Garcia also testified more generally about childhood sexual abuse. She stated that
it is difficult to successfully coach a child to make false accusations of abuse. Garcia testified that
in such situations, the child's statements will lack spontaneity and will, over time, become
contradictory. She explained that it is common for a child who has been sexually abused by a parent
to delay making an outcry until the abusive parent is no longer living with the child, and thus
disclosures of past abuse often occur when parents separate. Garcia testified that sexually abused
children sometimes display symptoms of post-traumatic stress disorder, one of which is flashbacks
in which they relive the traumatic experience. 

Payne conducted a second interview of H.S. at Hope House on September 12, 2007. 
During this interview, H.S. again described the butter knife incident she had first related to Garcia. 
H.S. also told Payne that appellant regularly came to her bedroom at night and "touch[ed] her in her
period spot and . . . she got scared and she started sleeping on the floor because she was afraid of him
hurting her . . . ." During this interview, H.S. reported for the first time that her sisters had also been
touched by appellant. A few days later, M.S., V.S., and G.S. were also interviewed at Hope House. 
Payne testified that each girl said that appellant had penetrated her sexual organ with his finger while
bathing her. All four sisters estimated that they had been two or three years old when appellant first
penetrated them. H.S. estimated that she had last been penetrated when she was ten.

Following the September interviews at Hope House, the four sisters were examined
by sexual assault nurse examiners Angela Wilke and Cathy Sparks. Wilke testified that H.S. told
her that appellant "touched me with a knife inside of me" and that "[i]t's been going on for years." 
Wilke said that H.S.'s hymen had a "complete tear through to the vaginal wall." The tear was
"well-healed" and could have occurred "anywhere from six months to ten years" before the
examination. According to Wilke, G.S.'s hymen had a "well-healed notch." No evidence of trauma
was found during the examinations of M.S. and V.S.

Appellant was indicted in January 2008. The indictment contained four counts,
one for each of appellant's four daughters. Each count alleged that appellant intentionally and
knowingly penetrated the child's sexual organ with his finger. 

All four sisters testified at the trial. H.S. testified that appellant put his finger inside
her period spot when they played "Tickle Monster." She also described the incident in the mall,
when appellant put his finger in her period spot while lifting her onto his shoulders. H.S. also
testified that one night, when she was sleeping on the couch, she saw appellant get a butter knife
from the kitchen. He then "took a little part, part of the knife, and put it in me." H.S. said that this
caused her to bleed "a little." M.S. testified that appellant "put his finger up my private" while
bathing her when she was about two years old. She also said that appellant's finger "went inside"
her "front part" once when he was wiping her. V.S. testified that appellant put his finger "in my
private" while she was bathing. G.S. testified that when she was "two or four," appellant put his
finger inside her "private" while she was in the bathtub.

During his own testimony, appellant acknowledged playing "Tickle Monster" with
his daughters and carrying them on his shoulders. He also conceded that he may have touched his
daughters' genital areas with his hand while bathing them. He denied, however, penetrating his
daughter's sexual organs with his finger.

Appellant's principal defensive theory was that Noel had coached or otherwise
induced H.S. and her sisters to make false accusations of sexual misconduct. As defense counsel
said during his opening statement, "this is a campaign by Noel Schoff to disassociate and separate
herself and her daughters from [appellant] for the rest of his and his daughters' lives." In support
of this theory, defense counsel cross-examined several of the State's witnesses--including Noel, the
lead sheriff's investigator, the forensic interviewer, and the sexual abuse counselor--regarding the
possibility that the children had been coached by their mother. Although Noel denied telling her
daughters what to say or encouraging them to accuse appellant of misconduct, the other witnesses
acknowledged that coaching was always a possibility. In fact, the defense offered evidence that
investigators and counselors initially had doubts about Noel's credibility and were concerned that
Noel might have been telling H.S. and her siblings what to say during interviews. The defense also
sought to portray Noel as having a controlling, domineering personality. Appellant testified that
Noel was a "control freak" who sought to "wear the pants" in the marriage. He said that although
he worked a part-time job at night in addition to his full-time day job, Noel accused him of being
lazy and complained that he was not sufficiently helpful around the house. Appellant's pastor, from
whom the couple had sought counseling, also testified that Noel "was very controlling, very
demanding." The defense also called numerous witnesses to testify to appellant's good character
and reputation for honesty, and to Noel's reputation for dishonesty. 

The jury returned a verdict convicting appellant of sexually assaulting H.S. The jury
found appellant not guilty on the counts accusing him of sexually assaulting his other daughters.


DISCUSSION


In his first issue on appeal, appellant contends that the trial court erred by permitting
Noel to testify regarding incidents in which appellant penetrated her with his finger without her
consent. Appellant urges that this was extraneous misconduct evidence having no relevance to any
disputed issue in the case, and that it served merely to show his bad character. See Tex. R.
Evid. 404(b). (2) The State responds that appellant opened the door to the testimony through his
cross-examination of Noel. The State also asserts that the testimony was relevant to rebut the
defensive theories of accident and lack of intent. We review the trial court's decision to admit the
evidence under an abuse of discretion standard, and we will disturb the trial court's ruling only if it
was outside the zone of reasonable disagreement. Moses v. State, 105 S.W.3d 622, 627 (Tex. Crim.
App. 2003).

The defense was made aware of the substance of the challenged testimony prior to
trial. At a hearing before testimony began, the court granted appellant's motion in limine prohibiting
the State from adducing the testimony without first approaching the bench and obtaining a ruling on
its admissibility at that time. 

During his cross-examination of Noel Schoff, defense counsel repeatedly asked her
why she had unquestioningly accepted the accusations against appellant:


 Q. And as I understand your prior testimony, you didn't question this at all
with her, you didn't go into any details with her, or when, or how, or why, or you
didn't even have any questions for your husband about it, did you?


A. At the very moment that it happened, all I wanted to do was take care of
[H.S.]. I didn't think to ask anything else. With what she said, it was pretty obvious,
and there were other reasons that would make me believe that.


. . .


Q. You chose, rather than to question her about it, you just went ahead and
chose to infer that there was something sexually about it that her daddy did to her,
rather than it being an accident, right?


A. There's other things that he had been doing that made me have not such
a hard time wondering.


. . . 


Q. Okay. So why wouldn't you think she has told one lie and she is telling
another lie to get out of that lie? I mean, you didn't even question her on it? You
jumped on it.


A. Because of other things I had experienced in the marriage.


. . .


Q. Why didn't you give him the benefit of the doubt?


A. Because of other things I had gone through with him in marriage, other
things.


. . .


Q. All four kids, either they were in the bath or they were being cleaned. 
You know, why couldn't you, as a wife of fifteen years and their mother, have just
thought, "Well, it was an accident. Your daddy didn't mean to hurt you. . . ." Why
didn't you tell her that instead of going off and inferring the sexual things against
your husband?


A. Number one, I have never, in cleaning a chid, put anything up inside of
anybody to the point of talking about that she was bleeding or anything else.


Number two, because of the things that had happened in my marriage before,
there were situations that happened.



At this point, the State asked to approach the bench saying, "It's regarding [defense counsel's]
Motion in Limine." Following this bench conference, which was not recorded, counsel resumed his
cross-examination and soon returned to the subject of Noel's failure to give appellant the benefit of
the doubt:


Q. Okay. So you didn't give the daddy the benefit of the doubt, that it could
have been an accident or parental cleaning, and you don't get on [H.S.] for maybe
lying about what she is telling about her daddy just to get out of trouble, you jump
on it and take opportunity with it?


A. Because of what I had experienced in my marriage.



During a subsequent break and outside the jury's presence, the prosecutor argued to
the court that "it is now permissible for me to ask Mrs. Schoff questions about, during the course of
their marital relationship, digital penetration situations between Mrs. Schoff and Mr. Schoff. It goes
to explain some of the questions she was limited from answering on cross." The State also urged
that this evidence was admissible to show absence of accident or mistake, and to show motive and
intent. Defense counsel argued that the proposed testimony was irrelevant because "the incidents
she wants to talk about are involving adult relationships between husband and wife . . . and in no
way, shape, form or fashion involves children . . . ." The court ruled that appellant had opened the
door to the testimony: "[Y]our questions were directed to this witness and what information she had
to support--" The court added, "[W]e heard numerous times her answer other things . . . . In fact,
the last round of questions, after it was already objected to and brought to our attention was, why
didn't she tell the girls that dad had made an accident, that there was a mistake . . . . To that extent,
I am going to allow you to go into it." Before the jury returned, the court clarified its ruling:


I want to clarify, I said that the door had been opened, and I believe it has, but I also
believe that the prosecution has proved an exception under 404(b). I also think it's
clear and it is the opinion of this Court that you can't request a Motion in Limine in
an attempt to bind the tongue of a witness and then turn around and ask a witness
questions that the witness is precluded from answering in an attempt to--or is an
indirect or direct means of impeaching the witness's veracity, character, or
credibility, and for that reason I am going to allow that testimony in.



The challenged testimony was adduced by the State on redirect, after the defense
concluded its initial cross-examination of Noel:


Q. . . . [Defense counsel] was asking you about, "Why did you just believe
[H.S.]? You just believed her, you didn't assume it was an accident, you didn't
assume it was a mistake?" And you kept trying to say, "Things from our marriage,
things from our marriage." What things?


A. One night I woke up and he had his finger inside of me, another time he
was raping me, but when he had his finger inside of me that one night and I woke up,
it was like, "What are you doing," and he was like, "I am just asleep, I don't know
what you are talking about," and I just ran in the other room because I didn't know
what to do . . . .


. . .


A. He would put his finger straight up into me when I would be in the
kitchen or whatever, the girls would be right there, and I would push him away and
tell him to stop.


Q. How often would that happen? How often would he digitally penetrate
you?


A. A lot.


. . .


Q. Okay. Not every day?


A. No, Ma'am.


Q. How often would you say?


A. A lot, and I kept telling him over and over again, that was a big fight we
would have, "I told you and I have told you over and over again, don't do that when
the girls are in the room."



Noel testified that appellant encouraged her to wear short skirts, but she did not want to wear them
because "it was easy access for him and I felt like a piece of meat when he did it. It wasn't a loving,
'I want to make love with you type of thing.' It was aggressive and it hurt." She testified that she
woke up to find appellant digitally penetrating her often enough that "it was hard for me to be around
him and didn't even want to make love to him anymore. I got to where I didn't want to have
anything to do with him sexually because I didn't feel like his wife anymore. I felt like a piece
of meat."

We conclude that the trial court properly admitted the challenged testimony under the
rule of optional completeness. Under this rule, "[w]hen part of an act, declaration, conversation,
writing or recorded statement is given in evidence by one party, the whole on the same subject may
be inquired into by the other, and any other act, declaration, writing or recorded statement which is
necessary to make it fully understood or to explain the same may also be given in evidence . . . ." 
Tex. R. Evid. 107. This rule permits the introduction of otherwise inadmissible evidence when that
evidence is necessary to fully and fairly explain a matter opened up by the adverse party. Walters
v. State, 247 S.W.3d 204, 217-18 (Tex. Crim. App. 2007) (citing Parr v. State, 557 S.W.2d 99, 102
(Tex. Crim. App. 1977)). It is designed to reduce the possibility of the jury receiving a false
impression from hearing only a part of some act, conversation, or writing. Id.

Defense counsel asked Noel six times why she had taken H.S.'s accusations, and later
those of her other daughters, at face value, without considering the possibility that the accusations
were false or that the incidents described were merely innocent accidents. Each time, Noel answered
that "other things" she had experienced in the marriage led her to believe the accusations. Appellant
argues that Noel could have answered the questions without making an "elliptical reference" to the
extraneous misconduct, but having repeatedly asked the question, appellant is in no position to
complain of the answer he received each time. After the defense adduced Noel's testimony that she
believed her daughters' accusations because of "other things" that had happened in her marriage, the
State was entitled to ask Noel what those things were.

Defense counsel also opened the door to the challenged testimony by cross-examining
Noel about her sexual relationship with appellant, including the unwelcome touching appellant now
contends was irrelevant and inadmissible. Counsel asked Noel if she "sometimes [was] awoken by
him playing with you"; she said that she was. Counsel asked Noel if she and appellant sometimes
had "intimate touching going on between each other"; she said that they did. Counsel asked Noel
if they were "discrete when it came to sex," prompting her to answer, "No, sir, and it made me very
angry when he wasn't." Counsel asked Noel, "Did you ever complain to [appellant] about him
touching your vagina while the girls were around?" She said that she did and added, in response to
counsel's follow-up questions, that she did not know if the girls ever saw appellant touch her in that
way. Finally, counsel asked Noel:


Q. Did you, after you had separated from [appellant], ever complain to any
of the counselors about his sexual advances to you during the course of the marriage?


A. What do you mean by sexual advances?


Q. Well, his ways of intimately letting you know he wanted to have sex, or
he was--


A. I complained about something, but it wasn't that . . . .


Q. Oh, that's where you talked about him walking up and touching your
vagina?


A. Yes.



By adducing this testimony regarding appellant's unwelcome sexual advances and touching, the
defense opened the door for the State to more fully develop the circumstances under which appellant
would touch and penetrate his wife with his fingers. (3)

The trial court did not abuse its discretion by admitting Noel's testimony regarding
the incidents in which appellant penetrated her with his finger without her consent. Issue one
is overruled.

Appellant's second issue complains of the admission of testimony by
Mendocino Barnes, to whom appellant was married from 1988 to 1990. Called by the State as a
rebuttal witness, Barnes testified, "[I]t's a very bizarre thing to be raped by your husband, and that
was a very frequent thing in our marriage." Asked if there was "sex without your consent," Barnes
replied, "Sexual acts, waking up and having him on top of me, being pinned down to the bed, being
touched in ways that I was not comfortable with outside of the house, hands up my skirt, things of
that nature." Barnes testified that appellant would fondle her breasts and put his hands up her skirt
or down her pants, even in public places. Appellant contends that this testimony was improper
character-conformity evidence having no relevance to any legitimate issue in the case. See Tex. R.
Evid. 404(b). (4) We again review the court's decision to admit the challenged testimony for an abuse
of discretion.

During his testimony, appellant denied engaging in the acts of sexual misconduct
described by Noel and discussed previously. The State argues that Barnes's testimony was
admissible to rebut those "affirmative misrepresentations" by appellant. See Lagrone v. State,
942 S.W.2d 602, 613 (Tex. Crim. App. 1997) (holding that specific instances of conduct are
admissible to "correct affirmative misrepresentations made on direct examination"); see also
Tex. R. Evid. 608(b) (prohibiting the use of specific instances of conduct to attack or support
witness's credibility). But appellant did not mention Barnes during his own testimony, much less
make any representations concerning his behavior, sexual or otherwise, during his marriage to her. 
Barnes's testimony did not rebut any affirmative misrepresentation made by appellant.

Alternatively, the State contends that Barnes's testimony was admissible to rebut
appellant's defensive theory that Noel had coached or otherwise used her domineering personality
to induce her daughters to falsely accuse appellant of sexual misconduct. But Barnes's testimony
describing how appellant forced her into unwanted sexual activity had no tendency to prove or
disprove appellant's suggestion that Noel was a manipulative "control freak" who would or could
coerce her daughters into making false accusations against their father. See Tex. R. Evid. 401
(defining "relevant evidence").

Finally, the State contends that Barnes's testimony was admissible to rebut the
suggestion, raised by defense counsel during his cross-examination of the State's witnesses, that if
appellant had penetrated his daughters with his finger, it had been an accident. Although we are
reluctant to second-guess a trial court's discretion to admit evidence, we conclude that the testimony
was also irrelevant to that issue. Barnes's testimony that appellant had touched her during their
marriage in ways or under circumstances that she found objectionable had little, if any, tendency to
suggest, beyond mere character conformity, that appellant had deliberately penetrated his minor
daughters with his finger. 

We are satisfied that any error in the admission of Barnes's testimony was harmless. 
See Tex. R. App. P. 44.2(b). The prosecutor mentioned Barnes's testimony in her final argument,
but only to remark that it tended to corroborate Noel's considerably longer and more detailed
testimony, the propriety of which we have already discussed. Insofar as the jurors may have been
concerned with the side issues regarding appellant's relationship with Noel, we are confident that
Barnes's testimony leant little additional force to Noel's testimony on that subject. We also note that
during the course of deliberations, the jury asked to hear portions of the counselor's testimony
regarding H.S.'s diagnosis of post-traumatic stress disorder. This suggests that the jurors'
deliberations were focused on the content of the girls' outcry statements and testimony, and on the
evidence (or lack of evidence) tending to corroborate the girls' accusations. This suggestion is also
bolstered by the fact that the jury found appellant not guilty of penetrating his three younger
daughters, as to whom there was considerably less corroborative evidence than there was in regard
to H.S. On this record, the admission of Barnes's challenged testimony did not affect appellant's
substantial rights. Issue two is overruled.

In his third and final issue, appellant contends that the evidence is factually
insufficient to support the jury's guilty verdict. When there is a challenge to the sufficiency of the
evidence to sustain a criminal conviction, the question presented is whether a rational trier of fact
could have found the essential elements of the offense beyond a reasonable doubt. Jackson
v. Virginia, 443 U.S. 307, 324 (1979); Clayton v. State, 235 S.W.3d 772, 778 (Tex. Crim. App.
2007); Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). In a factual sufficiency review,
all the evidence is considered in a neutral light, including the testimony of defense witnesses and the
existence of alternative hypotheses. Clewis v. State, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996);
Orona v. State, 836 S.W.2d 319, 321 (Tex. App.--Austin 1992, no pet.). Although due deference
must be accorded the fact finder's determinations, particularly those concerning the weight and
credibility of the evidence, the reviewing court may disagree with the result in order to prevent a
manifest injustice. Johnson, 23 S.W.3d at 9; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App.
1997). The evidence will be deemed factually insufficient if the evidence supporting the verdict is
so weak as to make the finding of guilt clearly wrong or manifestly unjust, or if the verdict is against
the great weight and preponderance of the available evidence. Watson v. State, 204 S.W.3d 404,
414-15 (Tex. Crim. App. 2006); Johnson, 23 S.W.3d at 11.

Appellant contends that the evidence supporting the verdict is too weak. He urges
that H.S.'s outcry statements and trial testimony were unbelievable. Appellant asserts that it is
unbelievable that he would engage in sexual activity while cleaning his daughter following an attack
of diarrhea. He considers H.S.'s testimony regarding the butter knife equally incredible, and notes
that the tear in H.S.'s hymen is not corroborative of her outcry because the nurse was unable to give
a precise date for the injury. The fact that H.S.'s outcries became more detailed over time is
evidence, in appellant's view, of the child having been coerced or influenced by the interview
process itself.

Appellant also contends that the evidence against the verdict substantially outweighs
the evidence supporting it. He points out that Noel admitted that H.S. sometimes lied. He also
stresses the testimony regarding the investigators' initial doubts regarding the truth of the
accusations. Appellant refers us to the testimony regarding Noel's bad reputation for truthfulness. 
In his brief, appellant refers to "at least 18 items of impeachment and circumstantial proof (not to
mention reputation testimony) supporting Appellant's theory that this child made up a lie to get out
of a lie. This was successful because it met her mother's emotional needs, a mother who appears
to be a professional victim/manipulator."

Appellant's arguments to this Court challenging the credibility of the State's
evidence, and in particular the credibility of H.S.'s outcry testimony, echo the arguments he made
to the jury at trial. The jury obviously resolved the credibility issues in the State's favor, at least with
respect to the accusation that appellant unlawfully penetrated H.S. A guilty verdict is not manifestly
unjust simply because the fact-finder resolved conflicting views of the evidence in the State's favor. 
Roise v. State, 7 S.W.3d 225, 233 (Tex. App.--Austin 1999, pet. ref'd). Viewing the record as a
whole in a neutral light, we conclude that the verdict convicting appellant of sexually assaulting H.S.
was neither manifestly unjust nor against the great weight and preponderance of the evidence. Issue
three is overruled.

The judgment of conviction is affirmed.



 __________________________________________

 Jan P. Patterson, Justice

Before Justices Patterson, Puryear and Pemberton

Affirmed

Filed: February 23, 2010

Do Not Publish
1. The evidence shows that H.S. referred to her sexual organ as her "period spot."
2. Appellant also contends that any probative value the evidence might have had was outweighed
by the danger of unfair prejudice. See Tex. R. Evid. 403. Appellant does not refer us to a trial
objection on this ground, and we do not find one. In the absence of an objection, appellant's
rule 403 argument was not preserved for appeal. See Montgomery v. State, 810 S.W.2d 372, 388
(Tex. Crim. App. 1991) (op. on reh'g).
3. We express no opinion on the State's alternative contention that the testimony was admissible
under rule 404(b) to rebut appellant's defensive theories.
4. Appellant also makes a rule 403 argument, but he did not object to Barnes's testimony on
that ground.