ACCEPTED
01-15-00279-CR
FIRST COURT OF APPEALS
HOUSTON, TEXAS
11/25/2015 4:09:07 PM
CHRISTOPHER PRINE
CLERK

## No. 01-15-00279-CR

In the
Court of Appeals
For the
First District of Texas
At Houston

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
11/25/2015 4:09:07 PM
CHRISTOPHER A. PRINE
Clerk

————————◆————————

## No. 1344346

In the 338th District Court
Of Harris County, Texas

————————◆————————

## Joseph Facundo
*Appellant*

*v.*

## The State of Texas
*Appellee*

————————◆————————

State's Appellate Brief

————————◆————————

**Clinton A. Morgan**
Assistant District Attorney
Harris County, Texas
State Bar No. 24071454
morgan_clinton@dao.hctx.net

1201 Franklin St., Suite 600
Houston, Texas 77002
Telephone: 713.274.5826

**Devon Anderson**
District Attorney
Harris County, Texas

**Justin Wood**
**Julie Fletcher**
Assistant District Attorneys
Harris County, Texas

Oral Argument Not Requested

## Statement Regarding Oral Argument

The appellant requested oral argument, though he gave no particular reason why. The State believes the briefs in this case adequately apprise this Court of the issues and the law, and any marginal benefit from oral argument does not justify the considerable amount of time that preparation for oral argument requires of the parties and the Court. Therefore, the State does not request oral argument.

## Identification of the Parties

Counsel for the State:

>   Devon Anderson
>   ⸺ District Attorney of Harris County

>   Justin Wood & Julie Fletcher
>   — Assistant District Attorneys at trial

>   Clinton A. Morgan
>   ⸺ Assistant District Attorney on appeal

Appellant:

>   Joseph Juan Facundo

Counsel for the Appellant:

>   Alvin E. Nunnery & Brennen Paul Dunn
>   — Counsel at trial

>   Patrick McCann & Dawn Zell Wright
>   — Counsel on appeal

Trial Court:

>   Frank Price
>   ⸺ Presiding judge

## Table of Contents

Statement Regarding Oral Argument .......................................................i

Identification of the Parties ......................................................... ii

Table of Contents ............................................................... iii

Index of Authorities ...............................................................v

Statement of the Case .........................................................1

Statement of Facts ..........................................................1

**Reply to Points One, Two, Three, and Four**

The only preserved objection to the admission of the appellant's jail calls is his Fifth Amendment complaint. However, because the appellant was not being interrogated by anyone associated with law enforcement, the Fifth Amendment has no application here.................... 3

    I.    Background ...................................................................... 3

        A.    The State's Evidence and the Jail Calls ............................... 3

        B.    The Appellant's Trial Objections ........................................ 8

    II.    The Appellant's Points.......................................................... 10

        A.    Reply to Point Four: The appellant's objection, made the day after the evidence was admitted, was untimely and preserved nothing for review..................................................................... 10

        B.    Reply to Point One: Statements made on a phone call to family members are not custodial statements for Fifth Amendment purposes................................................................. 14

        C.    Reply to Points Two and Three: The appellant's Sixth-Amendment and "due process" complaints were not timely presented to the trial court and thus present nothing for this Court's review............................................................... 15

**Reply to Points Five and Six**

The appellant's points make sense only if one presumes all Hispanic people live in ethnically segregated communities. Asking a venire member for his opinion on law enforcement "in your community where you live" is not a race-based question. ............................................... 16

    I.    Factual Background: The Appellant's *Batson* Challenges .......... 17

    II.    Legal Background: The Familiar *Batson* Framework ................... 18

    III.    Argument: The trial court was within its discretion to believe the State's facially race-neutral question was, in fact, a race-neutral question. ............................................................................... 19

**Reply to Point Seven**

The alleged hearsay the appellant complains about is so insignificant that it could not possibly have affected the trial. ........................................ 21

Conclusion ................................................................................. 25

Certificate of Compliance and Service ........................................... 26

# Index of Authorities

**Cases**

*Banargent v. State*
228 S.W.3d 393 (Tex. App.—
Houston [14th Dist.] 2007, pet. ref'd) .................................................................. 14

*Beall v. Ditmore*
867 S.W.2d 791 (Tex. App.—
El Paso 1993, writ denied) ........................................................................... 12, 13

*Castrejon v. State*
428 S.W.3d 179 (Tex. App.—
Houston [1st Dist.] 2014, no pet.) ........................................................................ 11

*Garcia v. State*
126 S.W.3d 921 (Tex. Crim. App. 2004) .............................................................. 24

*Gibson v. State*
144 S.W.3d 530 (Tex. Crim. App. 2004) .......................................................... 18, 21

*Jasper v. State*
61 S.W.3d 413 (Tex. Crim. App. 2001) ................................................................ 21

*Johnson v. State*
878 S.W.2d 164 (Tex. Crim. App. 1994) .............................................................. 11

*King v. State*
953 S.W.2d 266 (Tex. Crim. App. 1997) .............................................................. 22

*Lagrone v. State*
942 S.W.2d 602 (Tex. Crim. App. 1997) .............................................................. 13

*Moyer v. State*
948 S.W.2d 525 (Tex. App.—
Fort Worth 1997, pet. ref'd) ................................................................................ 24

*Purkett v. Elem*
514 U.S. 765 (1995) ............................................................................................ 18

*Smith v. State*
420 S.W.3d 207 (Tex. App.—
Houston [1st Dist.] 2013, pet. ref'd) .................................................................... 22

*State v. Scheineman*
  77 S.W.3d 810 (Tex. Crim. App. 2002) .................................................. 15

*Union City Body Co., v. Ramirez*
  911 S.W.2d 196 (Tex. App.—
  San Antonio 1995) (orig. proceeding) ............................................. 12

## Rules

Tᴇx. R. Eᴠɪᴅ. 103 ................................................................................... 15

Tᴇx. R. Eᴠɪᴅ. 803 ................................................................................... 23

## Statement of the Case

The appellant was indicted for capital murder committed during the course of a robbery. (CR 7). The appellant pleaded not guilty, but a jury found him guilty as charged. (CR 99, 101). As the State had not sought the death penalty, the trial court assessed punishment at confinement for life without the possibility of parole. (CR 101). The trial court certified the appellant's right of appeal and the appellant filed a notice of appeal. (CR 100, 104).

## Statement of Facts

The appellant used to go to a vacant house and get high with his friends Amber Thornton and Tony Escobar. (4 RR 55, 62). One day, they decided to rob and kill their drug dealer, Russell Lopez, so that they could get more drugs. (4 RR 72). The appellant called Lopez and arranged to go over to Lopez's house and trade a laptop for $60 worth of cocaine. (4 RR 74, 77). When they arrived, Lopez was sitting in the dining room; his 7-month old daughter was in a high chair, and the cocaine was on the table. (4 RR 77). The appellant took out a hammer that he was carrying in his pocket and struck Lopez on the head. (4 RR 78). Lopez wobbled a bit, then the appellant struck him again. (4 RR 78-

1

79). Lopez fell down, and the appellant continued to strike him repeatedly with both the face and claw of the hammer. [1] (4 RR 79). Escobar went into the back of the house and tied up Lopez's other two children in their bedroom. (4 RR 79-80). The robbers then ransacked the house, looking for valuables to steal. (4 RR 82).

At some point while looking for valuables, the appellant and Escobar dragged Lopez — who seems to have still be alive — from the kitchen into the bedroom. (4 RR 84). The appellant found a decorative sword and stabbed Lopez several times, including in the throat. (4 RR 84-86; 5 RR 50-51). The robbers loaded up a safe and a couple of thousand dollars' worth of items into Lopez's SUV. (4 RR 87). They dropped off the stolen goods at the vacant house, and then they dumped the SUV in a secluded location. (4 RR 87-88). Lopez's wife returned home shortly thereafter and discovered the gruesome scene. (3 RR 34-36, 205-06).

---

[1] The medical examiner testified that Lopez suffered "at least 16" blunt force impacts, and "approximately eight" instances of "sharp force trauma" that were consistent with being struck with the claw of a hammer. (5 RR 41-42, 48).

**Reply to Points One, Two, Three, and Four**

**The only preserved objection to the admission of the appellant's jail calls is his Fifth Amendment complaint. However, because the appellant was not being interrogated by anyone associated with law enforcement, the Fifth Amendment has no application here.**

The appellant's first four points all relate to the admission of recorded phone calls he made while he was in jail.

## I.    Background

### A.  The State's Evidence and the Jail Calls

The State presented a fair amount of straight-forward evidence of the appellant's guilt. Thornton testified to the all of the events surrounding the robbery and identified the appellant as the killer. (4 RR 74-88). Lopez's young son, C.L., identified the appellant as one of the robbers. (5 RR 142). And a jailhouse informant testified that the appellant had confessed to the murder, and that the appellant's nickname in jail was "Hammer." (5 RR 81-85).

The State also admitted evidence regarding the appellant's actions in the days after the murder. David Tillman testified that around that time the appellant came to his house and asked if he knew of a chop shop where he could get rid of a truck. (4 RR 177-78). Witnesses testified that after the appellant became a suspect in the police

3

investigation, he attempted to flee to Mexico but was arrested in Laredo. (4 RR 99-100; 5 RR 80).

While the appellant was in the Webb County jail, he made several phone calls that were recorded. State's Exhibit 111 is a CD containing audio file recordings of four of these phone calls. Because the file names on the exhibit are cumbersome and not helpfully descriptive, the State will assign numbers to the calls. Nothing in the record indicates what order these calls occurred in, but based on the content the State's appellate counsel would guess it is this order:

1. "JOSEPH FACUNDO DOB 11-17-1993.mp3" (6 minutes, 14 seconds)

2. "JOSEPH FACUNDO DOB 11-17-1993 2.mp3" (5 minutes, 43 seconds)

3. "13253675488328592674.wav" (11 minutes, 28 seconds)

4. "13254591348327662174.wav" (3 minutes, 4 seconds)

Phone call 1 is between the appellant and his mother. He starts off by proclaiming his innocence and saying that she needs to believe he is innocent. She asks if he did not do it, who did: "Because I know you know." He reiterates his innocence and then asks her to get him a lawyer. She is surprised to learn that he is presently in jail, so she asks for

4

details about that. He says that he is in Laredo. He then asks her whether she has gotten him a lawyer yet, and she details her efforts. The appellant then begins proclaiming his innocence, stating that he has people who will testify that he was "at the bayou" at the time of the murder, which will prove that he is innocent. She replies that he needs to wait until he has a lawyer and then tell "the detectives" about his alibi. The appellant begins crying, telling her that he is innocent and he wants to see her. His mother gets angry and tells him that he is going to have to start with a court-appointed lawyer before she can hire one for him. The appellant then detailed his arrest, and relayed the little bit of information he had been provided by the authorities in Webb County. His mother tells him that he needs to request a court-appointed lawyer so that he can then provide the police with his alibi. The appellant states that his alibi is that he and Escobar were at the bayou "with another friend of ours." The appellant says that he is working on finding out that other person's name. His mother replies that she knows that the appellant "knows something" about the murder. She also tells him not to talk to the police without his lawyer present.

Phone call 2 is between the appellant and Roy.  The appellant tells Roy that he needs Roy to get someone's phone number, but he does not

5

know the name of the person. The appellant tells Roy that this unnamed person was his alibi. The appellant says that, while he does not know the person's name, he knows him as "Blinky." Roy says that he knows of Blinky. Roy asks the appellant how he knows that Blinky will provide him with an alibi, and the appellant says he knows because he talked with Blinky about the matter before getting arrested. The appellant then changed the topic and told Roy to pressure the appellant's mother to get him a lawyer. Roy— who the appellant calls "dad" at times on this call — asks the appellant about his failed effort to escape to Mexico, and the appellant explains that he was unable to cross the border because he was "set up." Roy then returns to talking about getting a lawyer for the appellant. The appellant reiterates that he is innocent and has an alibi. Roy says that he would need to explain that to the lawyer, and the appellant entreats Roy to help his mother find a lawyer for him. Roy says that he will "see what [he] can do."

Phone call 3 is the appellant calling his mother. The conversation begins at the 1:39 mark. The call begins with the appellant's mother telling him that these phone calls are expensive. The appellant asks if she has hired a lawyer for him yet, and she says she has not. She advises him to watch what he says because the calls are recorded. They discuss

6

the logistics of a relative visiting him, and then they turn the topic back to the family hiring a lawyer for him. His mother gets upset at him and demands that he "have patience with us" in his demands for a lawyer. She advises him that if he's innocent, he "better start praying," after which he insists that he is innocent and claims that the only evidence against him was "that white girl" who said he was with her at the murder, but he was not there. The appellant's mother cautioned him against talking about the case on the phone; the appellant responded by claiming that police had not found his fingerprints at the scene. The discussion turned back toward acquiring a lawyer for him. The appellant said that Escobar had a lawyer, so he gave his mother information on how to find out how to contact Escobar's lawyer. The appellant's mother told the appellant that when he got a lawyer he needed to tell the lawyer everything, and not try to protect others or cover up information. After that, the conversation turned to mundane details of life from the appellant's mother. The call concludes with the appellant telling her he loves her, and then pleading for help.

Phone call 4 is the appellant calling a male whose name is inaudible. The conversation on call 4 begins at the 1:33 mark and lasts

less than half a minute. In this call, the appellant asks the other person to "give Blinky's number" to Roy.

At trial, the State also presented evidence that in the days after the murder the appellant pressured Jimmy Whalen, aka Blinky, to lie and state that he was the appellant's alibi. (5 RR 17).

### B. The Appellant's Trial Objections

When the State offered the jail calls into evidence, the appellant made numerous objections. First, defense counsel objected to "the predicate," claiming that no one had identified who the voices on the recording were and "whether the person operating this equipment was capable of doing it." (4 RR 32). Then, defense counsel claimed that recording inmates' jail calls was "tantamount to a wire tap," and, as there was no authority for a wire tap, the recordings were illegally obtained evidence that should be excluded. (4 RR 33). The trial court overruled these objections. (4 RR 33).

Defense counsel then objected based on "the violation of the Fifth Amendment." (4 RR 34). The only explanation defense counsel offered of this argument was that "[h]e's in custody at that point." (4 RR 34). A prosecutor responded that the appellant "is not subject to counsel on

8

the phone. He has no right to privacy to that conversation in jail, and the State would assert there's no Fifth Amendment violation." (4 RR 34-35). The trial court overruled the objection and stated that State's 111 was admitted into evidence. (4 RR 35). The State, however, asked to play the recordings "at a later time," and the trial court said that would be fine. (4 RR 35).

The next day, defense counsel stated that he had additional objections prior to the recordings being published to the jury. (5 RR 3).

> I would object to those portion of those conversations between my client and family members that deal with specifically his parents' efforts at retaining counsel on his behalf, his admonitions or warnings from his mother about not talking to law enforcement and everything pertaining to that subject matter of representation and counsel and his need not to talk to anyone, his need to immediately invoke his rights to counsel, and that whole line of conversation as being irrelevant. And since these are post arrest statements, a jury could hear that to potentially infer comments on his post-arrest right to silence. It is tantamount to an implicit suggestion perhaps of his guilt, and I just think it's irrelevant, inflammatory, and prejudicial.

(5 RR 3).

The trial court overruled the objection. (5 RR 3). A prosecutor then asked to "put something on the record," and noted that the exhibit was already in evidence and the objection was untimely. (5 RR 3-4). The prosecutor addressed the merits of the appellant's objection by noting

9

that none of the phone calls did involved law enforcement officers, thus the Fifth and Sixth Amendments were not implicated. (5 RR 4-5). The trial court replied by noting that the objection was overruled as "not timely." (5 RR 5).

## II.   The Appellant's Points

Because of the disjointed manner in which the appellant's arguments were presented to the trial court, the threshold question regarding the appellant's first three points is what arguments, exactly, were preserved. This is the matter addressed in his fourth point, which asserts that the trial court erred in overruling his second objection, made the day after the evidence was admitted, as untimely. The State will address the appellant's fourth point first.

### A. Reply to Point Four: The appellant's objection, made the day after the evidence was admitted, was untimely and preserved nothing for review.

In his fourth point of error, the appellant asserts that the trial court erred by overruling his second objection as untimely. (*See* Appellant's Brief at 27-29). The normal rule is that an objection must be raised as soon as the basis for objection becomes apparent, or else the matter is forfeited. *Johnson v. State*, 878 S.W.2d 164, 167 (Tex. Crim. App.

10

1994). The appellant argues that this rule should not apply here because his objection, though made well after the basis for the objection was apparent, still occurred before the evidence was published to the jury.

This Court faced an almost identical situation in *Castrejon v. State*, 428 S.W.3d 179 (Tex. App.—Houston [1st Dist.] 2014, no pet.). There, the State offered into evidence an audio recording and, over one objection, the trial court admitted it into evidence. *Castrejon*, 428 S.W.3d at 182-83. However, the State did not play the audio recording until closing argument, at which time the defendant raise a second, separate objection. *Id*. at 183. This Court held that, even though the second objection was made prior to the audio recording being published to the jury, the objection was untimely and presented nothing for review on appeal. *Id*. at 186.

The State believes that *Castrejon* controls here. The appellant's second objection, though made prior to publication of the audio recordings, was made well after the recordings were admitted into evidence. Therefore that objection was untimely and preserved nothing for review.

The only authority cited by the appellant to show that his second objection was still timely is dicta from a 20-year-old civil case from the

11

Fourth Court of Appeals. (*See* Appellant's Brief at 28). Upon closer analysis, though, this case does not actually help the appellant.

The appellant quotes *Union City Body Co., v. Ramirez*, 911 S.W.2d 196 (Tex. App.—San Antonio 1995) (orig. proceeding). This case involved multiple defendants. One of them moved for severance. The trial court granted the severance, but the next day another defendant, the Union City Body Company, objected to the severance. The trial court held the objection to severance was untimely, and a mandamus action ensued. In discussing the timeliness of the trial objection, the *Union City Body Co.* court used the sentence that the appellant quotes in his brief: 'Timeliness' defies definition and generally the question of what is timely or otherwise must be left to the sound discretion of the trial judge, but such objection need not be immediate." 911 S.W.2d at 201 (quoting *Beall v. Ditmore*, 867 S.W.2d 791, 795 (Tex. App.—El Paso 1993, writ denied)). The Fourth Court then went on to hold that the trial court was within its discretion to reject the objection as untimely. *Id*. at 202-203. Thus, if the rule of *Union City Body Co.* is that a trial court has discretion in determining whether a non-contemporaneous objection is timely, that would weigh in favor of upholding the trial court's

determination, in this case, that the appellant's non-contemporaneous objection was untimely.

The dicta in *Union City Body Co.* was a quote from another civil case, this one from the Eight Court of Appeals. In *Beall*, the defendant's attorney seems to have accidentally elicited inadmissible evidence on cross-examination, but then asked another, unrelated question and only objected after this subsequent question was answered. *Beall*, 867 S.W.2d at 793. The trial court seems to have treated the objection as timely enough and ruled on it. On appeal, the Eighth Court rejected the appellee's preservation argument and held that, even though the objection was not contemporaneous it was "timely" enough. *Id*. at 795. The Eighth Court then rejected the appellant's claim on the merits. *Id*. at 796.

Whatever the merits of the holding in *Beall* at the time and in the context of when it was decided, modern Texas criminal law applies a much stricter preservation requirement. *See, e.g., Lagrone v. State*, 942 S.W.2d 602, 618 (Tex. Crim. App. 1997) (where defense counsel did not object until after objectionable question was answered, objection was untimely and preserved nothing for review).

The appellant's second objection was untimely, and none of the arguments made in that objection are preserved for appeal. This Court should reject the appellant's fourth point (challenging the overruling of his second objection), and in dealing with the appellant's first three points this Court should restrict itself to considering the matters preserved in the appellant's first, timely objection.

**B. Reply to Point One: Statements made on a phone call to family members are not custodial statements for Fifth Amendment purposes.**

In his first point, the appellant claims that the statements he made on the phone calls were custodial statements, and thus they were inadmissible because he was not mirandized. (Appellant's Brief at 25; *see* 4 RR 34-35). However, the Fifth Amendment right to counsel applies only during interrogations with law enforcement agents; the appellant was placing phone calls to family members who seem to have had no connection with law enforcement, thus the Fifth Amendment has no application. See *Banargent v. State*, 228 S.W.3d 393, 402 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (recordings of phone calls made by defendant from prison were not the product of custodial interrogation); *State v. Scheineman*, 77 S.W.3d 810, 813 (Tex. Crim. App.

2002) (no custodial interrogation occurred when incarcerated defendant spoke in bugged jail room with incarcerated co-defendant). Because the objected-to statements were not the product of custodial interrogation, this Court should overrule the appellant's first point.

### C. Reply to Points Two and Three: The appellant's Sixth-Amendment and "due process" complaints were not timely presented to the trial court and thus present nothing for this Court's review.

In his second point of error, the appellant claims that recording the phone calls violated his Sixth Amendment right to counsel. (Appellant's Brief at 23-24, 26). However, the only time the appellant mentioned the Sixth Amendment at trial was during his second, untimely objection to the evidence. (*See* 4 RR 32-35; 5 RR 3-5). Because this argument was not presented to the trial court in a timely manner, it cannot be the basis of reversal on appeal. TEX. R. EVID. 103(a).

In his third point, the appellant claims that recording his phone calls violated "due process." (Appellant's Brief at 24-25, 27). This argument was never presented to the trial court and thus presents nothing for this court's review.

**Reply to Points Five and Six**

**The appellant's points make sense only if one presumes all Hispanic people live in ethnically segregated communities. Asking a venire member for his opinion on law enforcement "in your community where you live" is not a race-based question.**

In his fifth and sixth points of error, the appellant complains about the trial court's denial of a *Batson* challenge he raised during voir dire. The appellant separates this argument into two different points. In his sixth point, the appellant claims that the State violated the ban on striking jurors based on race announced in *Batson v. Kentucky*, 476 U.S. 79 (1986). (Appellant's Brief at 35-37). In his fifth point, the appellant argues that the State violated the Texas statutory ban on striking jurors based on race contained in Code of Criminal Procedure Article 35.261. (Appellant's Brief at 34-37). But Article 35.261 is simply a state codification of *Batson*. The State is not aware of any way in which appellate review of these claims differs, and the appellant does not point out any such distinctions in his brief. The State will brief this matter as a *Batson* challenge, as that is the more regularly cited authority.

## I. Factual Background: The Appellant's *Batson* Challenges

After the parties had made their strikes but before the jury was sworn, defense counsel objected because the State had used two of its peremptory strikes on venire members 26 and 34, who were Hispanic. (2 RR 196-97). According to defense counsel, there were three Hispanic members of the venire after the court had excused those who were challengeable for cause, meaning the State had struck "66% or two-thirds of the Hispanics on this panel." (2 RR 197).

The trial court asked the State to explain why it had struck venire members 26 and 34. (2 RR 197). The State explained that it had struck venire member 26 because when a prosecutor asked him to rate, on a 1-to-4 scale, his view of law enforcement, venire member 26 had selected 2. (2 RR 198, *see* 2 RR 81, 83). The State pointed out that it had struck everyone who answered 2 to that question. (2 RR 198). The State also said that venire member 26 had said he suffered from arthritis and believed he would have a hard time focusing on the case because of the pain. (2 RR 198).

Regarding venire member 34, the State explained that he, too, had answered "2" on the law-enforcement question. (2 RR 198-99, *see* 2 RR

17

81, 84). In addition, the State pointed out that venire member 34 had said he did not believe the State should prosecute capital murder cases. (2 RR 199, *see* 2 RR 74, 77). The State also pointed out that venire member 34 had said he did not find jailhouse informants credible. (2 RR 198, *see* 2 RR 65, 68). The trial court overruled the appellant's *Batson* challenge. (2 RR 199).

## II.   Legal Background: The Familiar *Batson* Framework

The three steps of a Batson hearing are well-known. First, the opponent of a peremptory strike must make out a prima facie case of racial discrimination. Second, the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation. Third, the trial court determines whether the opponent of the strike has proved purposeful racial discrimination. The burden of persuasion rests with, and never shifts from, the opponent of the strike. *Purkett v. Elem*, 514 U.S. 765, 767 (1995).

The determination of whether the proponent's explanation is a pretext "is solely a question of fact; there is no issue of law." *Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004). Because the trial court's fact finding will be based on factors not evident in the record,

such as the lawyers' courtroom demeanor and credibility, a reviewing court will give great deference to the fact finding and reverse only if the finding was clearly erroneous. *Ibid*.

**III. Argument: The trial court was within its discretion to believe the State's facially race-neutral question was, in fact, a race-neutral question.**

The appellant does not dispute that the State, as it claimed, actually struck all the remaining venire members who answered "2" to the question regarding law enforcement. (Appellant's Brief at 32). Instead, the appellant claims that the question itself was a method of racial discrimination because it inquired into the venire members' opinion of law enforcement "in your community where you live":

> Since it is not uncommon for people of similar race, nationalities, cultures and/or backgrounds to live in the same area and share similar opinions, including opinions about law enforcement, the answer solicited resulted in the same outcome as if the State would have asked, "In you Hispanic neighborhood, what is your opinion of law enforcement."

(Appellant's Brief at 36) (footnote omitted).

There are several possible ways to address this assertion. The first is to point out that it makes sense only if one assumes that all Hispanic

people live in ethnically segregated communities. That assumption is incorrect[2] and without basis in the record.

Another possible response to the appellant's assertion is that, even if true, it would not show racial discrimination. Defense counsel identified venire member 38 as the other Hispanic venire member. (2 RR 197). He answered "3" on the question about law enforcement and the State did not strike him.[3] (*See* 2 RR 81, 84). Accepting the appellant's assumption that all Hispanic people live in ethnically segregated communities, the State's failure to strike venire member 38 shows that the State was willing to accept people who lived in Hispanic communities where people had a more positive view of law enforcement. This would prove that the State struck venire members 26 and 34 based on their view of law enforcement and not on the fact that they lived in Hispanic communities.

The simplest and most basic response to the appellant's assertion is that the State provided a race-neutral explanation for its strikes, that

---

[2] *See* https://upload.wikimedia.org/wikipedia/commons/8/8a/Race_and_ethnicity_2010-_Houston.png (map, based on 2010 Census data, showing racial makeup of Houston).

[3] The State did not use all its strike, thus the prosecutors could have struck venire member 38 if they had intended to strike all Hispanic people from the jury. (*See* 2 RR 197).

explanation is supported by the record, and the trial court observed the demeanor of the prosecutors and believed the race-neutral explanation. In such a situation, this Court must defer to the trial court's finding and overrule the appellant's points. *See, e.g.*, *Jasper v. State*, 61 S.W.3d 413, 422 (Tex. Crim. App. 2001); *Gibson*, 114 S.W.3d at 534.

## Reply to Point Seven

**The alleged hearsay the appellant complains about is so insignificant that it could not possibly have affected the trial.**

State's Exhibit 3 is the report created by the paramedic who responded to the scene and found Lopez dead. (3 RR 54-57). The author of the report testified at trial. (3 RR 54). The State proffered it as a business record, exempt from the hearsay rule. (3 RR 55). When it was offered into evidence, the appellant objected that the narrative portion of the report contained hearsay within hearsay. (3 RR 55-56). The trial court overruled that objection. (3 RR 56). In his seventh point the appellant asserts that the trial court erred. (Appellant's Brief at 37-40).

The narrative portion of the report reads:

Upon arrival PT presented supine in bedroom of home. PT was covered in blood, Pulse less and Apneic. PT was cold and cyanotic with lividity. PT had sword laying across his left chest and left arm. PT had brain matter and skull

21

fragments beside his body. PT had laceration to right chest and throat. PT had penetrating trauma to right cheek esposing bone and tissue. 6 second strip performed showing Astyote. PT pronounced DOS due to unknown downtime and injuries incompatible with life. House had blood splatter on ceiling of bedroom just above the body as well as in living room and kitchen. Kitchen pantry had copious amounts of coagulated blood on floor. House appeared to be ran sacked as TV in bedroom was upside down on floor. Drawers in living room and bedroom were overturned. TV in living room was missing. PT family was taken to back bedroom awaiting SO arrival. Upon arrival of SO report given to officer. Assistant chief and Medic 41 remained on scene to give report to homicide detective.

(State's Ex. 3).

Error in the admission of evidence is non-constitutional error subject to harm analysis under Rule of Appellate Procedure 44.2(b). *Smith v. State*, 420 S.W.3d 207, 219 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd). Under this standard, appellate courts must disregard any error that did not affect the defendant's substantial rights. *Ibid*. A substantial right is affected when the error had a substantial and injurious effector influence in determining the jury's verdict. *Ibid*. (quoting *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)). This Court should affirm the conviction if, after reviewing the record, it has fair assurance that the error did not influence the jury, or had but a slight effect. *Ibid*.

Assuming, without conceding, that this was inadmissible hearsay, the State notes that the appellant offers no explanation of how the admission of the narrative paragraph harmed him. (*See* Appellant's Brief at 37-40). There was no dispute at trial over the fact that Lopez was killed, or over the manner in which he was killed. The narrative paragraph contains nothing that makes it more or less likely that the appellant was involved with the murder. The only information in this paragraph that was not admitted, without objection, through other witnesses are a couple of minor medical details (*e.g.* "6 second strip performed showing Astyote") that had no bearing on any issue at trial. This Court should reject the appellant's seventh point because the evidence of which he complained could not possibly have influenced the jury.

On the merits, though, this paragraph is not even inadmissible hearsay. All it contains is the observations of the paramedic who made the record, and this is plainly what is allowed under the business-records exception to the hearsay rule. *See* TEX. R. EVID. 803(6); *Moyer v. State*, 948 S.W.2d 525, 528 (Tex. App.—Fort Worth 1997, pet. ref'd) (paramedic's report of observations admissible as business record). Had the report contained information that someone else told the paramedic,

that would have been inadmissible hearsay within hearsay. *See, e.g.*, *Garcia v. State*, 126 S.W.3d 921, 926 (Tex. Crim. App. 2004). There is no indication that is the case here, however. The only example of supposed hearsay-within-hearsay that the appellants specified in his objection was the paramedic's observation that a television was missing. According to the appellant, "[s]omeone had to have told her" that there had been a television at the house in order for the paramedic to infer that a television was missing. But nothing in State's Exhibit 3 or the paramedic's testimony implies that someone told her a television was missing. According to another witness, there was a place in the living room where "it appeared to have had at some time a television in that location. There were cables coming out that … would have been going into a television." (3 RR 149 (describing crime scene photo, State's Exhibit 14, that is very difficult to make out in the appellate record)). Anyone familiar with a typical home could observe a blank spot on the wall or cabinet with wires going to it and conclude that a television was missing.

This Court should reject the appellant's seventh point. The evidence he complains of was not hearsay, and even if it was it was so insignificant that its admission does not warrant reversal.

## Conclusion

The State respectfully submits that all things are regular and the judgment of the trial court should be affirmed.

**DEVON ANDERSON**
District Attorney
Harris County, Texas


/s/ C.A. Morgan
**CLINTON A. MORGAN**
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas  77002
713.274.5826
Texas Bar No. 24071454

25

## Certificate of Compliance and Service

I certify that, according to Microsoft Word's word counting function, the portion of this brief for which Rule of Appellate Procedure 9.4(i)(1) requires a word count contains 5,132 words.

I also certify that I have requested that efile.txcourts.gov electronically serve a copy of this brief to:

Patrick McCann
writlawyer@justice.com

Dawn Zell Wright
zellwright@zwlaw.us

/s/ C.A. Morgan
**CLINTON A. MORGAN**
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas 77002-1923
713.274.5826
Texas Bar No. 24071454

Date: November 25, 2015